26 A.3d 397

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. DWAYNE GILLISPIE, DEFENDANT–RESPONDENT.

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. GREGORY BUTTLER, DEFENDANT–RESPONDENT.

Argued January 4, 2011—Decided June 9, 2011.

*Roberta DiBiase,* Assistant Prosecutor, argued the cause for appellants (*Marlene Lynch Ford,* Ocean County Prosecutor, attorney; *Michel A. Paulhus,* Executive Assistant Prosecutor, on the brief).

*Alan I. Smith,* Designated Counsel, argued the cause for respondent Dwayne Gillispie (*Yvonne Smith Segars,* Public Defender, attorney).

*Michael J. Confusione,* Designated Counsel, argued the cause for respondent Gregory Buttler (*Yvonne Smith Segars,* Public Defender, attorney).

Judge STERN (temporarily assigned) delivered the opinion of the Court.

We granted certification, following the Appellate Division's reversal of defendants' murder convictions at separate trials, to determine the State's obligation to "sanitize" the details of "other-crimes" evidence introduced under *N.J.R.E.* 404(b) to prove defendants' identity. During defendants' trials on offenses related to a double homicide that occurred in Barnegat on the evening of November 28, 2000, the State introduced other-crimes evidence concerning a robbery that had occurred at a barbershop in the Bronx twenty days earlier. The evidence established that the same handgun was used to perpetrate both the barbershop robbery and the subsequent murders, and the trial court admitted evidence of the barbershop robbery because it was deemed relevant to the disputed issue of identity.

In a consolidated opinion, the Appellate Division held that the prejudicial value of the other-crimes evidence substantially outweighed its probative value because the evidence was not properly sanitized. Furthermore, because the erroneous admission of the "other-crimes" evidence did not constitute harmless error, the panel reversed both convictions and remanded for a new trial.

We reverse the Appellate Division's judgment, and remand to that court for consideration of the other issues raised by defendants but not considered in light of its disposition.

## I.

On November 29, 2000, Christine Staton (Staton) and her twenty-five-year-old son, Lonell Michael (Michael), were found dead and bound together in her bedroom. Each had been killed from a gunshot wound to the back of the head. Staton's throat had also been slashed. The ensuing investigation led police to three primary suspects: defendant Gregory Buttler (Buttler), defendant Dwayne Gillispie (Gillispie),[1] and Keith Mercer (Mercer). On July 27, 2004, Gillispie and Buttler were indicted for first-degree conspiracy to commit murder; second-degree conspiracy to commit armed robbery; two counts each of capital murder, felony murder, first-degree robbery, and second-degree burglary; second-degree possession of a weapon for an unlawful purpose; third-degree unlawful possession of a weapon; and third-degree theft.[2]

Before their trials commenced, the State moved to introduce evidence that defendants had participated in a robbery and shooting that took place at a Bronx barbershop twenty days before the Barnegat murders. The trial court conducted a joint *N.J.R.E.* 104 hearing to determine whether the other-crimes evidence was admissible. At that hearing, the State called four witnesses: Mercer, an alleged accomplice to both the barbershop robbery and the Barnegat murders who was testifying against defendants pursuant to a plea agreement; New York City Detective Kevin Mojica, who had responded to the scene of the barbershop robbery and subsequently interviewed Gillispie after taking him into custody; Detective Kevin Barry, a ballistics expert; and Sol Cepero, a woman who had been sharing an apartment with Gillispie at the time that these crimes were committed.

---

[1] Some people knew Buttler as Gillispie's "unk," but it is not clear if Buttler was Gillispie's uncle.

[2] Buttler was also indicted for possession of a weapon by a convicted felon, but that charge was severed for trial and dismissed after the verdict was rendered.

At the *N.J.R.E.* 104 hearing, Mercer detailed his involvement with Gillispie and Buttler in the barbershop robbery, including the use of a gun that was also used to kill Staton and Michael. Detective Mojica testified that after Gillispie was arrested for the barbershop robbery, he admitted to committing it with an "accomplice." When told detectives from New Jersey wanted to talk with him about an incident there, Gillispie stated, "probably [the] same gun was used;" he then remarked, "[t]ell Jersey the guy you locked up is the guy who did the shooting in Jersey." However, Gillispie never implicated Buttler in his interview with Detective Mojica.

Next, Detective Barry testified and concluded, based on his expert examination of bullet cartridge casings, that the same gun had been used in both the barbershop robbery and the Barnegat murders. Finally, Cepero testified that on the morning after the Barnegat murders, Gillispie angrily confronted her, saying that someone had taken a ring from his pocket the night before—the ring being one shown to her following the murders. When Cepero's boyfriend intervened,[3] Gillispie struck the boyfriend in the head with the butt of a pistol and caused substantial bleeding. Cepero also testified that during this altercation, Gillispie pointed the gun at Cepero, cursed at her, and said, "I had to put bullet holes in motherf- - -ers" for the jewelry.

At the conclusion of the *N.J.R.E.* 104 hearing, counsel for both Buttler and Gillispie reiterated their continuing objections to admission of the evidence. However, the trial judge determined that, while the evidence "may be a part of a plan and it might be part of intent or proof of motive . . . the key issue here and the key exception, if you will, to the exclusion is the identity issue." The court found that the admission was controlled by, and satisfied, the four-prong test established by *State v. Cofield,* 127 *N.J.* 328, 605 *A.*2d 230 (1992). It found the first prong of *Cofield* was satisfied because the other-crimes evidence was relevant to the

---

[3] Cepero also referred to him as her husband.

issue of "identity as to whether or not Defendant Gillispie is the person who committed this crime." The court found the second prong—conduct similar in kind and close in time—was satisfied because both crimes were robberies of drug dealers, in which weapons were used and the incidents occurred within twenty days of each other. Prong three was deemed satisfied because Detective Barry's "expert testimony" made it "unquestionably clear and convincing" that the same gun was used in both robberies and was "strongly corroborative" of Mercer's testimony.

As to the fourth *Cofield* prong—whether the probative value of the evidence was outweighed by the prejudice to the defendant—the court acknowledged that all evidence offered by the State "is prejudicial by its nature." Nevertheless, the court also stated that the probative value of the evidence at issue was "extremely strong" as it was "directly related to [the] material issue of identity." Therefore, the court concluded by ruling that it was "clearly convinced that the probative value [of the other-crimes evidence] clearly and definitely outweighs any prejudice to the defendant[s]," and found the other-crimes evidence to be admissible at trial.[4]

## II.

After the pre-trial proceedings concluded, defendants' cases were severed for purposes of trial. The relevant evidence introduced at Gillispie and Buttler's respective trials is described below.

## A.

### Gillispie's Trial

At Gillispie's trial, Mercer testified about the Bronx robbery and the Barnegat murders. He testified pursuant to a plea

---

[4] However, the judge excluded evidence of Gillispie pointing the gun at Cepero while holding it up against a pillow because this was deemed to be too similar to the fashion in which Staton and Michael were murdered.

agreement and provided an exhaustive account of the events that transpired on the day of the Barnegat murders, including the details of Gillispie cutting Staton's throat in an effort to get Michael to disclose where the money was kept, and then shooting Staton and Michael in the head through a pillow.

Michael's girlfriend, Heather Ballman, testified that on November 28, 2000, Michael spoke to someone on his cell phone around 10:00 p.m. and then hurriedly asked Ballman to drive him to Cumberland Farms in Barnegat. Ballman testified that she last saw Michael getting into a dark colored car with Virginia license plates. At trial, the State further demonstrated that, after further investigation, the Ocean County Prosecutor's Office obtained information from Michael's cell phone records indicating that the last call Michael had received was from a phone registered to an individual named Shawnta Watkins.

Two detectives traveled to the Bronx, where Watkins lived, and within several minutes they observed a black Lexus with Virginia plates near Shawnta's residence being driven by Buttler. Shawnta advised the police that while the cell phone in question was purchased by and registered to her, it was actually used by her sister, Janyce Watkins. The police interviewed Janyce and recovered from her a diamond ring that matched a photograph of a diamond ring found in an appraisal folder at Staton's home.

Janyce Watkins confirmed those events through her testimony. She testified that, in November 2000, Buttler and Gillispie had discussed robbing a New Jersey drug dealer, and that the dealer would have to be killed because he knew Gillispie. Janyce also testified that on November 28, 2000, the day the murders took place, Buttler asked her to connect him (using a three-way dialing option on her cell phone) to a cell phone number that had a "609" area code. While listening in on the call, she overheard what she believed to be Buttler entering into a gun transaction with the party from New Jersey. Later that night, around 10:00 p.m., when Buttler was in New Jersey, he called Janyce, who was at home in the Bronx, and asked her to connect him once again to

the "609" number from earlier. Janyce complied, and overheard Gillispie and the "609" party agreeing to meet at Cumberland Farms. Janyce then testified that, later that night between 1:00 and 2:00 a.m., she met Buttler at a hotel in the Bronx where he gave her a diamond ring—which he admitted to acquiring by tying up, robbing, and killing two people from New Jersey.

Michael Kreybig, another State's witness, also placed Gillispie near Barnegat on the night of the murders. He testified that he sold drugs for Gillispie and that on November 28, 2000, he met with Gillispie near Barnegat and paid him $800. Kreybig further testified that, on the night in question, Gillispie was with two other men and was driving a black Lexus with Virginia license plates.

The State also called witnesses to establish that, twenty days before the Barnegat homicides, Gillispie and Buttler committed the attempted robbery of a barbershop in the Bronx, during which several people were shot but not killed.

Mercer began his testimony by indicating that he first met defendant Buttler in Lewisburg Penitentiary around August 1994. Mercer remained an "associate" of Buttler's—serving a subsequent prison term in New Jersey with Buttler—until the spring of 2000, when they were both released from prison. Around August 2000, Buttler contacted Mercer to ask whether Mercer knew any drug dealers that they might be able to rob. Mercer testified that Buttler told him not to worry about any robberies coming back to Mercer, because—in Mercer's opinion—Buttler was prepared to "kill" any drug dealers that he robbed. Mercer also stated that in October 2000, he rode with Buttler and Janyce Watkins in a black Lexus with Virginia plates to investigate a potential robbery target, but nothing came of that venture.

Mercer testified that, over the course of several months, Buttler continued asking about potential targets until eventually, in November, Buttler solicited Mercer's assistance in robbing a "hair salon [or barbershop] in the Bronx." Mercer admitted that he agreed to participate, and that he met up with Buttler to carry out the plan. At this point, Mercer testified that Buttler introduced

him to Gillispie, who would also participate in the robbery, and Mercer identified Gillispie in court. Mercer testified that the barbershop was selected because there was supposed to be a supply of marijuana in the basement, and no "resistance" was expected.

Mercer explained how he and Gillispie carried out the robbery:

> [Gillispie] came in 30 seconds—not long, right behind me.... And [Gillispie] was, like, on the count of ten, you know, we could take the place over. So he started counting, taking deep breaths: one, two. And by the time [a male patron] had got out of the chair and left, he had got to ten and pulled his gun out and got the guy that was getting ready to do his hair.
>
> . . .
>
> We were supposed to take them to the back, 'cause the marijuana was supposed to have been down in the basement. So we was going to take them in the back, and secure everyone in the back, and just go right down in the basement and take the weed, the marijuana.
>
> . . .
>
> By the time—I had about two girls in front of me and I think maybe the girl that was getting her hair done. And [Gillispie] had moved everyone else to the back. There was a little step that you had to go up to, to get to the back area all the way in the back.... And in not too long, I just hear a bunch of shots, a lot of shots just start ringing out, boom, boom, boom, boom, boom.

Mercer testified that he and Gillispie immediately "took off" and fled the scene without taking any proceeds. Mercer indicated Buttler was upset that Gillispie had "shot up the place" and that they "came out of there empty-handed."

The State also called Detective Barry as a ballistics expert in order to show that the same gun used in the barbershop robbery was also used in the Barnegat murders. Barry's ultimate conclusion was: "The total of five cartridge casings or shell casings from the hair salon, I compared to the two from New Jersey, and I found that the total of seven cartridge casings were all fired from one gun, the same gun." In support of that conclusion, the State elicited more specific testimony regarding the barbershop shell casings:

> A: I received a total of five .40 caliber cartridge casings, or discharge shells, and two bullets, .40 caliber bullets.
>
> . . .

A: This, again, is a property invoice, and it's numbered K–615274 and it describes property which I examined.

Q: What did you examine?

A: It was a .40 caliber bullet.

Q: Recovered from?

A: *Recovered from the victim* in the Bronx.

[ (emphasis supplied).]

Detective Mojica was called during Gillispie's trial as one of the officers that responded to the scene of the barbershop robbery in New York. He testified that "there were several people that were shot at that location." Mojica provided detailed testimony regarding his observations upon reaching the crime scene in the Bronx:

A: . . [T]here was a male being taken out on a stretcher at that point.

. . .

A: . . . [W]hen you walked toward the back of the location, there was blood on the floor on top of a couple of shell casings.

Q: And how—how many shooting victims were there?

A: There was three, total.

. . .

A: The worst one was Christopher Folks. He was shot—he was shot four times. There was a Keith Adams shot in the leg area, and a Valerie McCloud, also shot in the leg area.

. . .

Q: And what was the nature of Chris Folks' injuries?

A: Oh, he was the worst off.

. . .

Q: Did anybody die as a result of the shooting in the barbershop in the Bronx?

A: No, sir.

Mojica then testified regarding the procedure he employed to collect and properly preserve evidence, such as the shell casings and discharged bullets. During this aspect of his testimony, Mojica was questioned specifically about one copper round that was apparently recovered from a victim at the scene:

Q: Okay. And what is that form—what does that form voucher? What's the property that's listed on the form?

A: One copper round. I vouchered it.

Q: And who recovered that copper round?

A: I did.

Q: Okay. And where did you recover it?

A: It was at the crime scene.

Q: Where, specifically, at the crime scene?

A: Outside of the location. *My understanding was that it fell out of the body.*

Q: Of who?

A: Mr. Folks.

[ (emphasis supplied).]

Eventually, Detective Mojica had the opportunity to interview Gillispie regarding the barbershop robbery, and Mojica testified at length about what happened during the interview. Mojica testified that Gillispie told him the following:

At the time [of the robbery, Gillispie] was getting everybody to the rear of the ·barbershop, every—most people complied and were cooperative with him. . . . When [a male in the barbershop] invaded his space, at that point Mr. Gillispie struck him with the firearm. At that point he indicated that he let one round go, and it went into the air, and four other rounds hit the male.

Over objection, the State then had Mojica read directly from Gillispie's hand-written statement regarding the barbershop incident. The statement had been admitted into evidence, and provided:

A: "[I]n early November, I received a tip that a barbershop had just received a large quantity of weed. An associate and I went into the barbershop. . . . I pulled out a gun and demanded everyone to move to the back. While everyone was on my left and about to proceed to the basement which supposed—supposedly stored the weed, a man bumped into me diagonally from my right rear. I said to the man, 'What the f[- -]k are you doing?' At this point, he put his hands shoulder high. However, we were in very close proximity, so I hit him with the gun and took a step back. At this point he moved towards me, and we made physical contact. Somehow a shot went in the air, and approximately five more were fired, three to four hitting the same man, and two hitting two other individuals."

When Mojica finished questioning Gillispie about the Bronx barbershop robbery, he told Gillispie that detectives from New Jersey were there to speak to him. Mojica stated that Gillispie's response to this was, "[p]robably the same gun was used." Mojica's testimony continued:

Q: And had you—did you say something to [Gillispie] in response to that?

A: At that point, I said, "Talk to the guys in Jersey. Just—they are here, just talk to them." At that point, he looks me dead in the face, and· he goes, "Tell Jersey"—and he is pointing at me, and he says, "Tell Jersey the guy you locked up," and he points at me, and I'm like—"the guy you locked up is the guy who

did—who shot the people in New Jersey." And he goes, "The guy you locked up," and he's pointing at me, and he points at him, so he goes back and forth. And at this point, it's one of—still to this day, and I say it out of all the interviews, it's one of the most chilling statements that I've ever, you know, received from somebody.

. . .

Q: Is—what did the defendant say when he was pointing at you, and what did he say when he was pointing at himself?

[Objection overruled.]

A: "The guy you locked up"—I'm sorry. "The guy you locked up is the guy who shot the people in New Jersey." (The witness demonstrates.)

Sol Cepero testified at Gillispie's trial only. She lived in the same apartment as Gillispie, and she testified that around 1:30 a.m. on the night of the murders, Gillispie, a man she knew as his "uncle," and another man went into Gillispie's room. She testified that the other two men stayed there for about twenty minutes before leaving. Cepero testified that Gillispie then came to Cepero and her boyfriend, who had been watching TV, and showed them "some rings." Cepero testified that Gillispie asked them what they believed he could receive for the rings if he took them to a pawn shop. She suggested he would receive only "bullshit money" for the diamond ring from a pawnshop, and he should give it to his girlfriend instead.

At approximately 8:30 a.m. the next morning, Gillispie came out of his bedroom and Cepero testified that the following exchange occurred:

Q: All right. And when [Gillispie] comes out, what if anything does he say to you? Tell us the conversations.

A: Sol, has anyone—was anyone here last night? And I answered no. And he just kept asking me that question . . . So as he kept asking me, he was getting angrier.

. . .

A: So I—one of the times he came out, I saw my daughter's father give me a sign behind him, like trying to calm me down, and I looked at him, and he gave me a sign that he had a gun in his back pocket.

Q: Who's giving you the sign?

A: My daughter's father. He told me something—

[Hearsay objection overruled.]

. . .

> A: He came out telling me—asking me if anyone had been in the house, and I answered no. And he kept on asking me the same question . . . with a tone in his voice, so I knew . . . he was insinuating something . . . And then he said: Well, you know what? The rings were missing from his room.

Cepero continued to testify about the argument she had with Gillispie concerning the missing jewelry. Eventually, Cepero testified that Gillispie grabbed her boyfriend by his neck, took out a gun, and hit her boyfriend on the head with the butt of the weapon, causing the man to bleed "a lot" from his head. The argument continued, and Cepero testified that Gillispie pointed the gun at her, and "start[ed] cursing at me and then telling me, oh, you f- - - - -g people, you don't even know, I had to put bullet holes in motherf- - -ers for this shit, for the rings."

## B.

### *Buttler's Trial*

At Buttler's trial, Heather Ballman, Janyce Watkins, and Michael Kreybig gave essentially the same testimony they gave at Gillispie's trial. As mentioned above, Sol Cepero did not testify at Buttler's trial.

Mercer's testimony during Buttler's trial was also similar to his testimony at Gillispie's trial.[5] He explained in more detail, however, a conversation he had with his co-conspirators after the failed robbery in the Bronx:

> Q: What conversations transpired when you got in the car?
>
> A: [Buttler] started going off. Yo, listen, man—you know, telling [Gillispie], Why you shoot the place up? You know, so [Gillispie] was blaming me saying I let the guy come up and approach him.
>
> . . .
>
> A: Some—one of the guys I think he thinks tried to lunge for his gun, and that's why he started shooting.

In Buttler's trial, the other-crimes testimony was elicited from the ballistic expert, Detective Barry, in the same manner as in Gillis-

---

[5] Mercer did not testify at Buttler's trial that he met Buttler in prison, but merely indicated that he and Buttler had been "associates" since 1994.

pie's trial. However, the following question was also asked by the prosecutor:

> Q: Okay. Now, if I were to tell you the jury has already heard from Detective Mojica that that was the bullet that literally fell out of one of the victims at the barbershop, could you tell us, did you examine that?
>
> A: Yes I did.

However, that bullet "did not have sufficient markings on it to indicate [whether] it was fired from [the] same gun or not."

The testimony of Detective Mojica, the responding officer at the Bronx barbershop shooting, was more abbreviated during Buttler's trial because there was no confession to introduce. But the other-crimes testimony was largely the same. Detective Mojica again testified as to the scene when he arrived at the barbershop:

> Q: Can you describe the scene for us when you arrived there, detective?
>
> A: Wow. There were several uniformed officers on the scene. There was an ambulance at the location. There were several people shot.... And the most severe person, Christopher [Folks], who was shot, was being treated by the EMS.
>
> Q: Okay. And how many times was he shot, detective?
>
> A: Four times. When I arrived to the scene, they were bringing him out on the stretcher. His eyes were rolling back. His chest was open, so you saw a bunch of—you could see actually the entrance wounds. At that time, the uniformed officer, the first uniformed officer on the scene, secured the location. And there was another ambulance arriving at the same time, so—to treat the other people who were shot.

Mojica continued to explain how he processed the ballistics evidence at the scene. The copper-round was again addressed:

> A: It's one copper round that when Mr. [Folks] was being treated by EMS, they were pulling him out of the store, and—the store, the glass front, they were pulling him out. He was on a stretcher, and they hit the sidewalk. So he comes down on the sidewalk, and then they have to pick him up to put him inside the ambulance. And when they put him inside the ambulance and they lifted him up on the gurney, I don't know how, but it falls out of his body, this copper round.
>
> Q: You saw that happen?
>
> A: I picked it up.

### III.

A jury found Gillispie guilty on all counts charged, but did not reach a unanimous verdict as to the penalty. Following merger, Gillispie was sentenced to two consecutive terms of life imprison-

ment without parole for the murders of Staton and Michael, a term of five years imprisonment for unlawful possession of a weapon, and a term of ten years imprisonment, with 85% to be served before parole eligibility, on the two burglary counts. The sentences on the weapons offense and the burglaries were made to run concurrently to each other, but consecutively to the second life sentence.

The capital prosecution of Buttler was not pursued. A separate jury found him guilty on all charges. He was sentenced to two consecutive terms of life imprisonment with thirty years of parole ineligibility on each of the two counts of purposeful or knowing murder. The judge also imposed a five-year term for unlawful possession of a weapon, and a ten-year term of imprisonment on each count of burglary. These sentences were to run concurrently to each other, but consecutively to the two life sentences.

In an unpublished opinion, the Appellate Division reversed defendants' convictions and remanded for a new trial. The panel acknowledged that "[t]he admission of other-crimes evidence is left to the sound discretion of the trial court because it is in the best position to perform the balancing necessary under the *Cofield* test due to its intimate knowledge of the case." Using that standard, the panel turned to the four-part test articulated in *Cofield* to determine whether the admission of evidence pertaining to the barbershop robberies was proper.

The panel stated that the first prong was satisfied because the same gun was used in both shootings. The panel found that this convincingly linked defendants to the Barnegat murders. As such, the other-crimes evidence was indeed relevant on the disputed issue of identity. However, the panel explicitly rejected the State's contention that the other-crimes evidence was relevant to the question of plan because the barbershop robbery was not part of a sufficiently "integrated plan or scheme." The panel also concluded that the evidence was irrelevant to the issue of motive because the barbershop robbery merely evinced a "general propensity to commit violent robberies."

The panel found that the other-crimes evidence failed the second prong of *Cofield*, however, because the two crimes at issue were "very different." Nevertheless, the panel acknowledged that the second prong does not need to be satisfied in every case. Because "defendants' connection with the gun and not the similarity of the crimes was the reason for admitting the evidence," the panel determined the second prong was not relevant for its analysis.

The panel found that the third prong was also satisfied because the evidence relating to the Bronx barbershop shooting was demonstrated in a "clear and convincing" fashion. In fact, Mercer's testimony alone, if believed by the jury, was deemed to be more than sufficient to meet that standard. In addition to Mercer's testimony, however, "the record also contained Gillispie's statement to Officer Mojica."

The fourth prong of *Cofield* requires that the probative value of the other-crimes evidence outweigh its prejudicial effect. The panel held that the probative value of the ballistics match outweighed its prejudicial value. However, because the trial court did not "take appropriate steps to reduce the inherent prejudice of that evidence by considering whether it [could have been reasonably] presented to the jury in a less prejudicial form," the court concluded that admission of the details surrounding the barbershop robbery was unduly prejudicial.

In sum, according to the panel, "the proofs of defendants' involvement with the gun used in an earlier incident was properly admitted into evidence. However, evidence about the details of the incident and the shooting of three people was prejudicial and not outweighed by any probative value, and was not properly admitted into evidence." The panel further concluded that the error was not harmless, reversed the convictions, and remanded for a new trial.

Additionally, the panel briefly addressed two issues in Gillispie's appeal that were likely to recur on retrial. In short, the panel found that Cepero's testimony concerning Gillispie's conduct the

day after the killings—striking Cepero's boyfriend with the butt of his gun and causing him to bleed—was improperly admitted as part of the "res gestae" connected with his statement that he had to "put bullet holes in [people] for the rings." There was no suggestion that the admission of the rings stolen from the victims was itself inadmissible.

Finally, the panel also stated that, on retrial, the trial court should "instruct[ ] the jury that it must take into account Mercer's plea agreement when assessing his credibility and that Mercer's guilty plea is not substantive evidence of Gillispie's guilt," relying on our recent opinion in *State v. Adams*, 194 *N.J.* 186, 208, 943 *A.*2d 851 (2008).

As noted at the outset, we granted the State's petition for certification.

## IV.

The State contends that the trial court's failure to adequately sanitize the otherwise admissible other-crimes evidence was "harmless in light of overwhelming evidence of both defendants' guilt." In advancing this argument, the State claims that had the trial court sanitized the evidence, only an insignificant amount of testimony would have been excluded. The State further contends that there is ample remaining evidence to implicate defendants, as relevant to each trial, including: Gillispie's admission to Mojica that he was the "guy who did the shooting in Jersey"; Janyce Watkins's testimony that she heard Gillispie and Buttler planning the robberies and murders; Michael Kreybig's testimony indicating that he met Gillispie, driving a black Lexus with Virginia plates, in Barnegat on the night in question; Mercer's detailed testimony concerning the sequence of events on the day of the Barnegat killings, including his graphic description of the actual murders; various testimony indicating that phone records linked Michael to Buttler on the night of the murders; Cepero's testimony concerning the rings and Gillispie's statement to her that he shot someone to obtain them; and Heather Ballman's testimony

that she dropped Michael off at Cumberland Farms to meet someone driving a black Lexus with Virginia tags. According to the State, this clearly admissible evidence provided overwhelming proof of the guilt of both defendants without any need to refer to the details of the Bronx robberies.

The State further argues that Gillispie's use of the gun in striking Cepero's boyfriend should be considered a statement against interest and was therefore appropriately admitted into evidence. The State claims that Gillispie's wielding of the gun was "an explicit yet nonverbal threat that, having shot people before, he would shoot again if necessary to reclaim his bounty." Alternatively, the State contends that even if this evidence was improperly admitted, its admission constitutes harmless error, in light of the overwhelming evidence of Gillispie's guilt.

Finally, the State contends that any omissions in the jury charge, if erroneous, were also harmless. The trial court's failure to charge that the jury must consider Mercer's guilty plea when assessing his credibility was harmless due to the extensive cross-examination concerning Mercer's plea agreement. For the same reason, the State argues that the trial court's failure to charge the jury that it may not use the plea of a testifying co-defendant as substantive evidence of guilt was also harmless.

Gillispie and Buttler agree with the Appellate Division's opinion and argue that the evidence concerning the barbershop robbery was improperly admitted. Relying on their Appellate Division briefs, defendants contend that the first prong of *Cofield* was not satisfied because the barbershop robbery did not uniquely match the Barnegat incident and was, in any event, outweighed by its prejudice. Independent of the unsanitized evidence of another shooting, they assert that defendants' identity was clearly established by Mercer's trial testimony about the Barnegat murders.[6]

---

[6] If we understand the argument correctly, the fact that unnecessary cumulative evidence is admitted has to be evaluated in light of the harmless error argument.

In any event, too much detail about the Bronx shootings requires affirmance of the Appellate Division's judgment, particularly because no limiting or cautionary instruction was given to the jury.

Buttler further argues that even if the first prong is satisfied relating to the issue of identity, the jury was improperly permitted to consider the other-crimes evidence as it related to the issues of motive and plan. Furthermore, the prosecutor highlighted the issues of motive and plan in his summation. Buttler notes one portion of the prosecutor's summation in particular to highlight the impermissible effect the other-crimes evidence may have had on the jury:

> The barbershop is very important in this case, because it gives you an insight into how this defendant operates. He *planned* the barbershop. He recruited Gillispie to go in. He recruited Mercer to go in. He drove. He provided the handguns. He picked the target.... That's this defendant. He doesn't actually get his hands dirty, but he's hands on.

> The barbershop proves *motive* in this case. The *motive* is to get money, drugs, valuables. *Common scheme or plan?* Rob a drug dealer.

[ (emphasis supplied).] [7]

Defendants also argue that the third prong of *Cofield* requires the State to demonstrate that "the person against whom the evidence is being used [is the person that] actually committed the crime," (citing *State v. G.V.*, 162 *N.J.* 252, 275, 744 *A.*2d 137 (2000) (Coleman, J. concurring in part and dissenting in part)). Defendants argue that Mercer's testimony is the only thing indicating that Gillispie (rather than Mercer) fired the gun. Since Mercer's testimony must be evaluated in light of his "favorable plea agreement," both defendants contend that the third prong of *Cofield* cannot be clearly and convincingly satisfied.

---

[7] The prosecutor made no such use of the barbershop robbery in his closing summation at Gillispie's trial. However, at the close of Gillispie's trial, the judge gave a limiting instruction that was virtually identical to the charge in Buttler's subsequent trial regarding the use of evidence of motive and plan as well as identity.

Defendants further contend that the fourth prong cannot be satisfied because the other-crimes evidence was far too specific and inflammatory, and therefore unduly prejudicial.

In Gillispie's Appellate Division brief, he also challenges the admission of Cepero's testimony regarding his conduct on the morning of November 29, 2000. Gillispie concedes that "[c]onduct which is the subject matter of the action being tried is *res gestae* and is not susceptible to a *N.J.R.E.* 404(b) analysis." [8] However, he contends that since Cepero's testimony concerned acts that occurred at a time clearly distinguishable from the actual murders, a proper *N.J.R.E.* 404(b) analysis should have taken place on this issue and "would likely have" excluded the evidence.

Finally, Gillispie contends that the jury charge concerning Mercer's testimony was improper. Gillispie argues that "[i]n a jury charge that consisted of almost 100 pages of trial transcript, not once did the trial court mention the plea agreement." Since Mercer's testimony undoubtedly was the linchpin of the State's case against both Gillispie and Buttler, Gillispie argues that the standard instruction on credibility—"which ignored the significance of the plea agreement"—was insufficient. Similarly, Gillispie also argues that the trial court's failure to instruct the jury that Mercer's guilty plea should not have been used by the jury as substantive evidence of defendants' guilt constituted plain error.

## V.

We briefly address Gillispie's claims about the lack of a specific charge on the impact of Mercer's plea agreement in his case. The issue has now been resolved in *State v. Adams*, 194 *N.J.* 186, 208, 943 *A.2d* 851 (2008), but as Gillispie did not cross petition for certification, request a relevant charge, or demonstrate any prejudice by the absence of a charge that the plea could not be considered as substantive evidence, we simply note that the Appel-

---

[8] This concession is now outdated by *State v. Rose*, 206 *N.J.* 141, 19 *A.3d* 985 (2011).

late Division did not reverse on this basis, and merely pointed out what should be charged in the event of a retrial. We have now addressed the need for the charge in *Adams,* and there is no basis to reverse on this ground with respect to trials occurring before *Adams* was decided.

Similarly, in the absence of a cross-petition for certification, and the absence of an Appellate Division holding on any of the many issues raised by defendants in that court, no claim by defendant is before us and if we agree with the State's argument on this appeal, there is no basis to affirm the judgment under review.

## VI.

We now turn to the critical issues concerning the *N.J.R.E.* 404(b) evidence and start with a familiar recitation about its admissibility.

### A.

Trial court decisions concerning the admission of other-crimes evidence should be afforded "great deference," and will be reversed only in light of a "clear error of judgment." *State v. Barden,* 195 *N.J.* 375, 390–91, 949 *A.2d* 820 (2008). The admissibility of such evidence is left to the sound discretion of the trial court, as that court is in the best position to conduct the balancing required under *Cofield* due to its "intimate knowledge of the case." *State v. Covell,* 157 *N.J.* 554, 564, 725 *A.2d* 675 (1999) (citing *State v. Ramseur,* 106 *N.J.* 123, 266, 524 *A.2d* 188 (1987)). Therefore, a trial court's decision concerning the admission of other-crimes evidence will not be disturbed absent a finding of abuse of discretion. *Id.* at 564, 725 *A.2d* 675.

### B.

The admission of other-crimes evidence is governed by *N.J.R.E.* 404(b), which provides:

[E]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute. [*Ibid.*]

*Rule* 404(b) is designed "to strike a balance between the prejudice to a defendant that is inherent in other-crimes evidence and the recognition that the evidence may be highly relevant to prove a defendant's guilt of the crime charged." *Barden, supra,* 195 *N.J.* at 388, 949 *A.*2d 820.

██ Because other-crimes evidence has a "unique tendency" to prejudice a jury against the defendant, it must be admitted cautiously. *State v. Reddish,* 181 *N.J.* 553, 608, 859 *A.*2d 1173 (2004). This Court has also acknowledged that "[t]he 'inflammatory characteristic of other-crime evidence . . . mandates a careful and pragmatic evaluation by trial courts, based on the specific context in which the evidence is offered, to determine whether the probative worth of the evidence outweighs its potential for undue prejudice.'" *Cofield, supra,* 127 *N.J.* at 334, 605 *A.*2d 230 (quoting *State v. Stevens,* 115 *N.J.* 289, 303, 558 *A.*2d 833 (1989)). Thus, *N.J.R.E.* 404(b) is generally viewed as a rule of exclusion rather than a rule of inclusion. *State v. Darby,* 174 *N.J.* 509, 520, 809 *A.*2d 138 (2002) (citing *State v. Marrero,* 148 *N.J.* 469, 482–83, 691 *A.*2d 293 (1997); *Cofield, supra,* 127 *N.J.* at 337, 605 *A.*2d 230). Given the nature of the evidence and the balance which must be struck, in *Cofield* we established the four-part test to deal with the noted concerns associated with other-crimes evidence. To be admissible:

1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[*Cofield, supra,* 127 *N.J.* at 338, 605 *A.*2d 230 (quoting Abraham P. Ordover, *Balancing the Presumptions of Guilt and Innocence: Rules* 404(b), 608(b), and 609(a), 38 *Emory L.J.* 135, 160 (1989)).]

To satisfy the first prong, the State's proffered evidence must be "relevant to a material issue genuinely in dispute." *Darby, supra,* 174 *N.J.* at 519, 809 *A.*2d 138. *N.J.R.E.* 401 defines relevant evidence as any evidence that has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *Ibid.* The main inquiry deals with " 'the logical connection between the proffered evidence and a fact in issue.' " *Darby, supra,* 174 *N.J.* at 519, 809 *A.*2d 138 (quoting *State v. Hutchins,* 241 *N.J.Super.* 353, 358, 575 *A.*2d 35 (App.Div.1990)). *See also State v. Rose, supra,* 206 *N.J.* 141 at 185, 19 *A.*3d 985.

Despite prior rulings indicating that proof of identity is limited to testimony of the defendant's participation in a similar or "signature" crime, *see State v. Reldan,* 185 *N.J.Super.* 494, 502, 449 *A.*2d 1317 (App.Div.), *certif. denied,* 91 *N.J.* 543, 453 *A.*2d 862 (1982), *N.J.R.E.* 404(b) is not so narrow with respect to proof of identity. If a defendant can be connected to a weapon or disguise used in a prior criminal transaction, it can serve to identify him or tie him to a similar event. *State v. Porambo,* 226 *N.J.Super.* 416, 423–24, 544 *A.*2d 870 (App.Div.1988) (admitting evidence of disguise observed at two separate crime scenes and subsequently found in defendant's car); *State v. Hardaway,* 269 *N.J.Super.* 627, 630, 636 *A.*2d 128 (App.Div.1994) (permitting introduction of gun found at subsequent crime scene because it proved defendant's identity and presence, but reversing conviction because of details of events of unrelated crime).

## C.

The Appellate Division in this case stated that proof of a defendant's use or possession of a weapon in one crime can be evidence of the identity of the person who used the same weapon in another crime. The panel found that since the same gun was used in both the Bronx barbershop robbery and the Barnegat killings, proof of defendants' involvement in the Bronx robbery was relevant evidence in linking defendants to the Barnegat killings. In this determination, the panel primarily relied on

established case law. *See State v. Hardaway, supra,* 269 *N.J.Super.* at 629–30, 636 *A.*2d 128; *see also State v. Carswell,* 303 *N.J.Super.* 462, 697 *A.*2d 171 (App.Div.1997) (permitting admission of evidence that defendant had carried a gun on other occasions in trial concerning whether defendant had threatened someone with a gun).

However, subsequent to the decisions in these cited cases, we addressed the issue of identity in the context of a signature crime, and arguably applied a stricter test than that relied upon by the Appellate Division in this appeal. To determine whether other-crimes evidence shall be admitted on the issue of identity, we said:

[T]he prior criminal activity with which defendant is identified must be so nearly identical in method as to earmark the crime as defendant's handiwork. The conduct in question must be unusual and distinctive so as to be like a signature, and there must be proof of sufficient facts in both crimes to establish an unusual pattern.

[*State v. Fortin,* 162 *N.J.* 517, 532, 745 *A.*2d 509 (2000) (citing *State v. Reldan, supra,* 185 *N.J.Super.* at 502, 449 *A.*2d 1317.) ] [9]

*Fortin* must be understood in context and does not preclude admission of the gun to link the murder weapon to defendants in this case. In fact, *Fortin* cited to a passage from *Cofield* that noted, "the distinctive features of a silver pistol used in a prior crime would be admissible under [former] Evidence Rule 55 [now *N.J.R.E.* 404(b) ] in an unrelated murder trial to establish either

---

[9] New Jersey's *Model Jury Charge*—to be used where the limited purpose for which other-crimes evidence is offered is to prove identity—also suggests that the State's burden in admitting such evidence might be more stringent than the Appellate Division indicated:

Here, the evidence has been offered to attempt to convince you that [the prior crime] and [the charged crime] are so similar and so unique that you may infer that the same person committed both of them. You may not draw this inference unless you conclude that the prior criminal activity with which defendant is identified is so nearly identical in method as to earmark the crime as defendant's handiwork. The conduct in question must be unusual and distinctive so as to be like a signature, and there must be proof of sufficient facts in both crimes to establish an unusual pattern.

The charge must be reconsidered and adjusted to be fact sensitive to a case like this.

the identity of the perpetrator or the weapon used." *Fortin, supra,* 162 *N.J.* at 529, 745 *A.*2d 509 (quoting *Cofield, supra,* 127 *N.J.* at 336, 605 *A.*2d 230). That is precisely the purpose for which the evidence relating to the use of the gun in the barbershop shootings is admissible in this case; indeed, the ballistics findings matching the gun to both crimes is even more compelling than the "silver pistol" example in *Cofield.*

Where a signature crime is alleged, circumstantial evidence is key, and the unique common features among the crimes must be nearly identical. But that is not the case where, as here, an object can be linked directly to the defendant for purposes of identification. Therefore, "an object associating the defendant with the crime" is admissible to prove identity. *Weinstein on Evidence* ¶ 404[15], "Character Used for Proper Purposes: Relevancy of Other Crime to Issue Other than Propensity; Identity" n. 6 (citing *United States v. Covelli,* 738 *F.*2d 847, 855–56 (7th Cir.), *cert. denied,* 469 *U.S.* 867, 105 *S.Ct.* 211, 83 *L.Ed.*2d 141 (1984) (prior possession of small caliber weapon admissible as probative of possession of murder weapon and ultimate identification of defendant); *United States v. Two Eagle,* 633 *F.*2d 93 (8th Cir.1980) (observation of defendant in stolen car admissible as to identity of defendant who fled from crime scene in victim's vehicle)). The fact that ballistics testing revealed that the gun used in the Bronx barbershop shooting was the same as the gun used in the Barnegat murders is highly relevant to the disputed material issue of identity given the evidence linking defendants to the Bronx barbershop shooting. Accordingly, because we are not dealing with a "signature crime," we agree with the Appellate Division's holding under the first prong.

 This Court has recently noted "that the second prong [of *Cofield* ] may be eliminated where it serves no beneficial purpose." *Barden, supra,* 195 *N.J.* at 389, 949 *A.*2d 820 (citing *State v. Williams,* 190 *N.J.* 114, 131, 919 *A.*2d 90 (2007)). The usefulness of the second prong "as a requirement is limited to cases that replicate the circumstances in *Cofield,* in which evidence of drug

possession that occurred subsequent to the drug incident that was the subject of the prosecution was relevant to prove possession of the drugs in the charged offense." *Barden, supra*, 195 *N.J.* at 389, 949 *A.*2d 820 (internal quotations omitted). The Appellate Division stated that since the other-crimes evidence here dealt with defendants' connection with the gun and not the similarity of the crimes, the second prong is irrelevant for the purposes of this case, and we agree.

"The third prong of our *Cofield* test requires that the judge serve as gatekeeper to the admission of other-crime evidence." *State v. Hernandez*, 170 *N.J.* 106, 123, 784 *A.*2d 1225 (2001). In other words, the trial court must determine that proof of the other-crimes evidence is established clearly and convincingly. *Ibid.* We have rejected a "per se ban on accomplice testimony in support of other-crime evidence," and have explicitly stated that "the combination of the requirement of clear and convincing proof of relevant other-crime evidence, coupled with the weighing of probative value against the danger of undue prejudice, provides an adequate standard for a court's exercise of its gatekeeping function." *Id.* at 124–25, 784 *A.*2d 1225. Given the testimony of Detectives Barry and Mojica and Gillispie's own statement, the trial judge did not abuse his discretion in admitting the evidence of the gun on this basis.

However, as in numerous other cases, the difficult issue before us arises under the fourth prong and the necessary balance between relevancy, *N.J.R.E.* 401–402, and undue prejudice. *N.J.R.E.* 403. *See State v. Rose, supra*, 206 *N.J.* 141 at 160–61, 19 *A.*3d 985.

We have acknowledged that the fourth prong of the *Cofield* test is the "most difficult part of the test." *Barden, supra*, 195 *N.J.* at 389, 949 *A.*2d 820. Due to the inherently prejudicial nature of other-crimes evidence,

> the trial court must engage in a careful and pragmatic evaluation of the evidence to determine whether the probative worth of the evidence is outweighed by its

potential for undue prejudice. In the weighing process, the court should also consider the availability of other evidence that can be used to prove the same point. [*Ibid.* (internal citations and quotations omitted).]

Such evidence shall be excluded "only when its probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the issues in the case." *State v. Koskovich,* 168 *N.J.* 448, 486, 776 *A.*2d 144 (2001). The details of the proofs concerning the "other crimes" must be considered in this context.

The Appellate Division relied on our decision in *State v. Darby* to support its opinion that the fourth prong had not been satisfied. In *Darby, supra,* 174 *N.J.* at 513–15, 809 *A.*2d 138, we overturned an armed-robbery conviction because the defendant's accomplice had been permitted to testify that he and the defendant had participated in the armed robbery of another store eleven days later. In that case, the State's main argument in support of the proffered evidence was that it corroborated the testimony of the accomplice. *Id.* at 520–21, 809 *A.*2d 138. In reversing the conviction, we stated that even if the other three *Cofield* prongs had been met, where "the other-crime evidence informed the jury that not only did the defendant have the propensity to commit robberies, but that he used the same gun eleven days later to commit another robbery," the prejudicial effect of that evidence far outweighed its probative value. *Ibid.* There, the purpose and effect of the admission was neither to show a true "signature crime" or identify a particular weapon, but rather to bolster the credibility of the testifying accomplice. Moreover, to reduce the inherent prejudice in the admission of other-crimes evidence, this Court has emphasized that trial courts must "sanitize the evidence when appropriate." *Barden, supra,* 195 *N.J.* at 390, 949 *A.*2d 820 (citing *Collier, supra,* 316 *N.J.Super.* at 185, 719 *A.*2d 1276).

█ Certainly, as noted with respect to the first prong, it was relevant and probative to link the weapon used by Gillispie in the Bronx to the murders in Barnegat. Detective Barry testified that the gun that was discharged in the barbershop was the weapon

used to murder Staton and Michael. But he could not place either defendant at the scene of the murder. Mercer identified Gillispie as the shooter at both locations. Independent of the fact that his credibility was under attack based on defendants' attempt to point the finger at him and his negotiated plea agreement, the fact that the same gun was used in the Bronx shooting and Barnegat murders was admissible to prove identity under *Cofield.*

However, there is no excuse for admitting the unduly prejudicial evidence of the details of the barbershop robbery, including that a bullet fell from the body of a victim. The fact that the gun used in the Bronx shooting was the same gun used in the Barnegat murders, coupled with Gillispie's admission to its possession while in custody in the Bronx, would have sufficed to prove identity without the details involving the actual shootings and the injury of Folks. The State undoubtedly proffered this additional evidence to bolster Mercer's credibility—a purpose that this Court has again recently held to be impermissible. *See State v. P.S.,* 202 *N.J.* 232, 256, 997 *A.*2d 163 (2010) ("If other-crime evidence is admissible merely to support the credibility of a witness, then the *Cofield* standard designed to severely limit the use of such highly inflammatory evidence becomes meaningless.").

Here, much like the case in *Darby,* the details of the other-crimes evidence demonstrated that Gillispie and Buttler had the propensity to commit violent robberies and used the same gun within twenty days in the commission of the two crimes. Even if the fact that the same weapon was used by the perpetrators of the barbershop robbery and the Barnegat murders was especially probative, the jury was not merely informed that the same gun was used in both crimes. Rather, the jury was exposed to detailed testimony from Mercer concerning how the barbershop robbery was planned and executed; detailed and particularly graphic testimony from Detective Mojica concerning how the barbershop crime scene looked when he arrived and the steps he took to process a copper bullet that had literally fallen out of a victim; testimony from Detective Mojica during Gillispie's trial

concerning statements Gillispie made to him about the barbershop robbery, including a vivid written statement concerning his actions during the barbershop robbery; and testimony from Detective Barry reiterating that one of the bullets from the barbershop had fallen from a victim. Hence, we hold that while the first three prongs of the *Cofield* test were satisfied, the admission of the details of the barbershop robbery was unduly prejudicial and was not outweighed by any probative value. We thus agree with the Appellate Division that the admission of the detailed evidence concerning the barbershop shootings violated the fourth prong of *Cofield* and should not have been admitted.[10]

## D.

We take this occasion to remind litigants and trial judges that other-crimes evidence must be appropriately sanitized. *See Hardaway, supra,* 269 *N.J.Super.* at 631, 636 *A.*2d 128. Independently, we also emphasize the importance of a firm and clear jury instruction when dealing with other-crimes evidence:

> [B]ecause the inherently prejudicial nature of such evidence casts doubt on a jury's ability to follow even the most precise limiting instruction, the court's instruction should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere.
>
> [*Cofield, supra,* 127 *N.J.* at 340–41, 605 *A.*2d 230 (citing *Stevens, supra,* 115 *N.J.* at 309, 558 *A.*2d 833).]

Thus, a trial court must "explain to the jury the limited purpose for which the other-crimes evidence is being offered." *Fortin, supra,* 162 *N.J.* at 534, 745 *A.*2d 509. Further, "a court should not state generally the content of *N.J.R.E.* 404(b), but should 'state specifically the purposes for which the evidence may be considered and, to the extent necessary for the jury's understanding, the issues on which such evidence is not to be considered.' " *Ibid.*

---

[10] The trial court also allowed the evidence on the issues of motive and plan. We need not address those subjects in light of our disposition, but note that we generally agree with the Appellate Division as to those issues.

(quoting *Stevens, supra,* 115 *N.J.* at 309, 558 *A.*2d 833). The instructions should be timely given both when the evidence is admitted and in the final charge. *Id.* at 534–35, 745 *A.*2d 509.

■ In the present case, because of its ruling the trial court gave a general instruction that encompassed identification, motive, and plan. Instead, the trial court should have instructed that the evidence regarding the barbershop robbery (including evidence of a shooting which led to the police possession of the cartridge casings—but limited to its essentials) be considered only for the limited purpose of tying the murder weapon to Gillispie and his accomplice—in other words, only for the issue of identity and not to bolster Mercer's credibility or as propensity evidence.

## VII.

■ It is the State's primary contention in its petition for certification that, despite the panel's finding of errors, Gillispie and Buttler both received fair trials, and any alleged errors were harmless. We agree.

It is undeniable that there was overwhelming proof submitted by the State throughout each trial of defendants' guilt, independent of the other-crimes evidence and beyond that proffered through Mercer. Gillispie admitted to Detective Mojica that he was the "guy" who committed the Barnegat crimes. No issue is now raised as to that admission. Janyce Watkins heard Gillispie and Buttler planning the robbery and murder of a drug dealer from New Jersey. Michael Kreybig's testimony placed Gillispie in Barnegat on the night of the murders. Mercer's testimony essentially provided an uninterrupted narration of the entire chain of events on the day of the murder. Cepero's testimony linked Gillispie to two stolen rings that were identified by Staton's estranged husband.

The case against Buttler presents a closer call. He made no confession and was not observed with a gun. However, the prejudicial details regarding the Bronx robberies were not admitted at his trial; Cepero did not testify at his trial; and he made

admissions to Janyce Watkins regarding the stolen rings and shooting the victims. Finally, Michael was actually linked to Buttler through the use of several different phone records, including the final call made to Michael's cell phone, which was received from Janyce Watkins's cell phone at 10:18 p.m. on the night of the murders.

However, there were serious credibility issues raised by the defense, including those caused by Janyce Watkins' assistance and protection by the State. Also, Michael Kreybig was an admitted drug dealer himself. In addition, Mercer—who had admitted to being in and out of prison—was probed extensively on cross-examination regarding the favorable plea arrangement he had entered into with the prosecution, and defense counsel exposed inconsistencies in Mercer's testimony. Nevertheless, the credibility issues were fully developed before the jury instructions about credibility and motive to lie were given,[11] and the other crimes evidence was admissible in Buttler's trial without the prejudicial detail. We cannot therefore sustain the reversal of either conviction merely because of that excess. The critical issue as to Buttler was whether he was Gillispie's accomplice, and the proofs on that issue were undeniable.

## VIII.

The judgment of the Appellate Division is reversed, and the matter is remanded for disposition of the issues not decided by that court.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, RIVERA–SOTO, HOENS and Judge STERN (temporarily assigned)—7.

*Opposed*—None.

---

[11] An express instruction on the need to give "careful scrutiny" to Mercer's "accomplice testimony" was also given at Buttler's trial. There was no objection to the relevant charges.