# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1343-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RASHID S. POWELL,
a/k/a DEXTER I. CLIMESON,
KEITH CLIMESON,
CHRISTOPH JOHNSON,
CHRISTOPH E. JOHNSON,
RASHAD S. POWELL, and,
ANTHONY SIMON,

    Defendant-Appellant.

_____

Submitted March 17, 2021 – Decided July 13, 2021

Before Judges Alvarez, Geiger, and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment Nos. 12-10-0796 and 12-10-0797.

Joseph E. Krakora, Public Defender, attorney for appellant (Stephen W. Kirsch, Designated Counsel, on the brief).

Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney for respondent (Michele C. Buckley, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

A jury found defendant guilty of twelve counts of first-degree aggravated sexual assault during the course of a burglary or robbery, N.J.S.A. 2C:14-2(a)(3) (one, four, seven, fifteen, eighteen, twenty-one, twenty-nine, thirty-two, thirty-five, forty-three, forty-six, and forty-nine); twelve counts of first-degree armed aggravated sexual assault, N.J.S.A. 2C:14-2(a)(4) (two, five, eight, sixteen, nineteen, twenty-two, thirty, thirty-three, thirty-six, forty-four, forty-seven, and fifty); twelve counts of second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1) (three, six, nine, seventeen, twenty, twenty-three, thirty-one, thirty-four, thirty-seven, forty-five, forty-eight, fifty-one); eight counts of first-degree robbery, N.J.S.A. 2C:15-1(a) (ten, eleven, twenty-four, twenty-five, thirty-eight, thirty-nine, fifty-two, fifty-three); four counts of second-degree burglary, N.J.S.A. 2C:18-2 (twelve, twenty-six, forty, fifty-four); four counts of second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (thirteen, twenty-seven, forty-one, and fifty-five); and four counts of second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (fourteen, twenty-eight,

2

forty-two, fifty-six). Under a separate indictment, number 12-10-0797, the same jury convicted defendant during a second trial of four counts of second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7 (counts one, two, three, and four) as charged in indictment number 12-10-0796.

On August 16, 2018, the trial judge merged thirty-six convictions into the twenty remaining. He merged the four burglary and four possession of a weapon for unlawful purpose convictions into the eight robberies, and twenty-eight sexual assault or aggravated sexual assault convictions into the eight convictions for aggravated sexual assault while committing a robbery or burglary, essentially one as to each of the eight separate victims. The judge did not merge the robbery convictions into the aggravated sexual assault counts, nor did he merge the unlawful possession of a handgun without a permit, nor the possession of weapons by a convicted person. He determined that the sentences for the certain persons not to possess would be served consecutive to each other, and consecutive to the prison terms defendant received on the eight aggravated sexual assault counts, the controlling offenses for purpose of sentence.

Defendant was sentenced to four consecutive twenty-year terms of incarceration subject to eighty-five percent parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for the four aggravated

A-1343-18

sexual assault convictions involving the female victims. The judge sentenced defendant to four consecutive twelve-year terms of incarceration, also subject to NERA, for the four aggravated sexual assault convictions involving male victims.

As to the twelve remaining convictions that survived merger—the robberies and unlawful possessions of a handgun without a permit—those were to be served concurrently to the aggravated sexual assault prison terms. Thus, defendant's sentence aggregated to a 128-year NERA term on the first indictment.

The court sentenced defendant on the second indictment to consecutive five-year prison terms subject to five years of parole ineligibility, resulting in a twenty-year aggregate sentence subject to twenty years of parole ineligibility, to be served consecutive to the prison terms on the first indictment. Thus, defendant's total sentence is 148 years.

Following sentencing, the court dismissed without prejudice counts fifty-seven through seventy-one of the first indictment, and counts five and six of the second. They pertained to two incidents of sexual assault, involving different victims, that had on defendant's motion been previously severed from the other charges.

A-1343-18

Defendant appeals his convictions and sentence as to both indictments. We affirm, but remand to correct technical errors in the sentence.

The trial record establishes that defendant on four separate dates engaged in armed robberies and aggravated sexual assaults of couples staying in motels in a particular geographic area. In each, defendant was initially masked. We describe the incidents only in the detail necessary to address defendant's points on appeal.

The State's proofs as to each occurrence included the identification by the victims of defendant's photograph and in court, the identification of the vehicle he used—which belonged to a girlfriend, and the seizure of clothing and the handgun from a second girlfriend's apartment. The clothing and gun matched the descriptions by the victims, and DNA from those items matched DNA taken from swabs from three of the victims as well as defendant's sample.

<u>Incident No. 1</u>

On March 9, 2012, M.D. (Maude[1]), her sister C.D. (Chloe), Chloe's boyfriend, and W.E. (Walt), Chloe's boyfriend's uncle, drove to a motel in

---

[1] We protect the identity of the victims by use of initials and pseudonyms. <u>See</u> <u>R.</u> 1:38-3(c)(12). We also use initials when describing the testimony or other involvement of persons contacted during the investigation to aid in protecting the victims' identity.

Linden, located near U.S. Highway Routes 1 and 9. They drank at the motel bar, and in the early morning hours of March 10, 2012, checked into a room. At some point thereafter, Chloe and her boyfriend left, leaving Maude and Walt behind.

Maude and Walt heard a knock at the door. When Walt opened it, a man holding a gun pushed into the room. He wore a black leather jacket, black ski mask, and black boots. The gun, an automatic weapon with a bottom-loaded clip, was long and silver with a black stripe on the grip. Maude ran to the bathroom, looking for a way out, when the gunman, later identified as defendant, screamed at her. She heard him make a "clicking" sound with his gun.

When Walt saw the gunman click the gun, ejecting a bullet, the gunman commented that the bullet "could have been" for Walt. He demanded that Maude and Walt turn over their licenses and cell phones and ordered them to strip. Maude tried to leave her underwear on but was ordered to remove it. When Walt's cell phone rang the gunman told him that his nephew had "set [him] up" and used the nephew's name. Walt testified the gunman likely learned the name from looking at his phone, as his nephew was in his contacts, and his name would come up when he called.

A-1343-18

While holding the gun, the gunman ordered Maude and Walt to engage in sexual activities, including intercourse. The gunman took photographs using Maude's phone. She later learned he sent the pictures to contacts she had recently messaged.

At one point, the gunman lifted his mask up part of the way and stuck his tongue out at Maude. When he lifted the mask, Maude saw part of his face.

The gunman ordered Walt into the bathroom and told him to stay there. Walt tried to exit once but was ordered back. He did not leave the bathroom again until thirty minutes later when he heard the motel phone ring. By that time, the room was empty.

When Walt entered the bathroom, the gunman took off his mask and Maude saw his face. While pointing the gun at her, he ordered her to perform oral sex on him, and he then vaginally penetrated her without a condom, all the while making remarks she later said were "weird" and "freaked [her] out." He then ordered her to get dressed. The gunman returned her phone and college identification but refused to return her laptop or her government-issued identification. He told her that if she did not call the police, he would return in twenty days with the laptop, and left.

A-1343-18

Maude fled the motel room and drove to her sister's home. They went to a hospital where she submitted to a forensic medical examination by an on-call Sexual Assault Nurse Examiner. The Nurse Examiner took oral, buccal, fingernail, vaginal, cervical, and anal swabs from Maude, placing them, along with Maude's undergarments, in sealed bags.

Walt wrapped himself in a sheet and left the motel. Video surveillance footage showed a taxi picking up a man wrapped in a blanket from the motel parking lot around 5 a.m. The taxi driver testified that he picked up a man from the motel that night who was covered in a blanket and who had to have someone pay the cab fare when he arrived at his destination.

At a photo array some thirty-seven days after the incident, Maude identified defendant as the gunman. She also identified him at trial. Walt, who did not see defendant's face, was unable to identify him.

Incident No. 2

Four nights after the first incident, in the early evening hours of March 14, 2012, A.H. (Alex) and T.D. (Tina) checked into the same motel in Linden. After they entered their room, Tina went immediately into the bathroom, while Alex turned on the jacuzzi. Alex answered a knock at the door and saw a man with a dark complexion and bright pink lips, a feature Maude had noted when

A-1343-18

describing the gunman, and "a black thing on his head," which Alex would later recognize as a ski mask once it was pulled down. The man said he was looking for someone whose name Alex did not recognize, and Alex said he was not there and closed the door. Shortly thereafter, when Alex cracked the door open to go outside, the man pushed through holding a silver-and-black automatic handgun. He wore a black leather jacket and black pants.

Alex and Tina both ran to the bathroom, but before they could close the door, the gunman pulled it open and ordered them out. He demanded their money and told them to remove their clothing. As he spoke, he lifted his mask, enabling Tina and Alex to see his face. They turned over the $25 or $30 in cash each had in their pockets.

As in the first incident, the gunman ordered the couple to engage in sexual intercourse, eventually ordering Alex into the bathroom. While Alex was in the bathroom, defendant digitally penetrated Tina. He ordered Alex to return and again attempt to have relations with Tina, eventually ordering them back into the bathroom. Alex and Tina heard a commotion; Alex left the bathroom and ran to the clerk for help.

When Tina left the bathroom, she saw her purse, bag, and clothes floating in the jacuzzi water, and that her wallet was gone. She was in a state of shock

A-1343-18

and could not give a formal statement when police officers arrived. Tina refused to go to the hospital, later explaining that she was tired and "didn't want to be touched again." The responding officer testified that she appeared confused, quiet, shy, and afraid.

Tina and Alex separately identified defendant as the assailant from photo arrays conducted outside each other's presence about a month afterwards, and at trial. Both said they were "100% sure" of the identification.

Incident No. 3

Two weeks later, on March 26, 2012, J.P. (Jill) and J.H. (Jalen) checked into a motel on Routes 1 and 9 in Elizabeth. As they pulled into the parking lot, Jill noticed a white Acura sports utility vehicle (SUV) in one of the parking spaces.

Jill and Jalen were having sexual relations in the room when a masked man broke in. He wore a black leather jacket and jeans and carried a gun, a silver automatic pistol with a clip that loaded from the bottom. The gunman took their belongings, demanded their money, and told them to strip. Jalen turned over the money in his pocket.

Once they stripped, the gunman ordered Jill to perform oral sex on Jalen, and for the couple to engage in intercourse. Shortly thereafter, he told Jalen to

stop, gave him his pants and told him to go into the bathroom. While he was there, the gunman digitally penetrated Jill, holding the gun on her as he did. He put on a condom, removed his mask, and vaginally penetrated Jill. When Jill attempted to get a glimpse of his face, the gunman told her not to look at him or he would shoot her and leave her "stinking."

When Jalen came out of the bathroom, the gunman ordered him to get back. Jalen discovered a window in the bathroom, jumped out of it, and went to the front desk to call the police.

Meanwhile, the gunman ordered Jill to call for Jalen and when he did not respond, to knock on the door. When there was no answer, the gunman remarked to Jill that her friend "left you for me."

As Jalen headed back towards the room, he saw a man he believed to be the gunman headed towards a vehicle. After the man left, Jalen returned to the room.

When police arrived at the scene, Jalen and Jill appeared distraught. They were able to describe their attacker's vehicle as a white SUV with a Pennsylvania license plate. Elizabeth Police Department Detective Benny Carvalho saw a vehicle matching that description in the parking lot on the motel's surveillance footage from that evening. Jill identified defendant from photographs.

11

## Incident No. 4

Some thirteen days later, on April 8, 2012, R.C. (Rory) and S.T. (Sara), checked into a motel in Elizabeth at approximately 2 a.m. It too was located on Routes 1 and 9, approximately two miles from the motel in the third incident.

On their way to their motel room, the couple saw a man talking into his cell phone, standing just to the left of a doorway. He wore a black leather jacket, jeans, and what appeared to be a winter "beanie" hat. Rory "locked eyes" with the man, getting a good look at his face. The area was well-lit, and the man was standing close to them. Rory also noticed a white "minivan" in the parking lot which, unlike all the other cars, faced away from the motel.

The moment Rory opened the door to the room, the man on the cell phone forced his way in, pointing a gun into Rory's back. Defendant at that point pulled the beanie down to cover his face—it looked like "a homemade ski mask" with "two holes" cut out for eyes. Rory felt confused—since he had just seen the same man a few seconds earlier not wearing a mask, he did not understand the mask's purpose. Once in the room, the man ordered Sara and Rory to the wall at the other end. Sara was crying, panicking, and struggling to move. Rory saw the gun was silver and appeared to be an automatic weapon with a bottom-loaded clip.

A-1343-18

Once against the motel room wall, the gunman ordered the couple to turn over their valuables, including their phones and wallets, made them undress, and forced Sara to perform oral sex on Rory. Rory told her she did not have to, at which point the gunman threatened to kill them both. He was ten feet away and pointing the gun directly at Rory. Sara wept throughout the incident. The gunman ordered them to stop and instructed Rory to go into the bathroom. He pointed the gun at Sara and warned Rory that if he left the bathroom, he would hurt her. Rory complied.

The gunman, once Rory was in the bathroom with the door closed, pulled his pants down and demanded that Sara perform oral sex on him. He placed one of his hands on the back of her head while, with the other, he continued to point the gun at her. Sara testified that she felt she "wasn't really there" and had died. After a time, the gunman stopped and ordered her to lay down on the bed. He then, while using a condom, vaginally penetrated her. Defendant asked her questions and made her scream the answers so that Rory could hear. He asked Sara if the information on her identification was accurate, threatening to kill her and her family if she was being deceitful to him. Sara complied with all of defendant's requests.

The gunman vaginally and anally penetrated Sara, while she screamed from pain. Eventually, he got dressed, and began to slowly back away towards the door, still pointing the gun at her.

When Rory opened the door, he saw Sara trembling, blood covering her legs. Still naked, Rory ran out of the motel room as a white car with the lights on started to drive away. Rory memorized the license plate number, noting it was not from New Jersey. Rory ran towards the motel office screaming "help" and "rape," dialed 9-1-1, and returned to the motel room where Sara lay crying on the bed.

When police arrived, Rory gave them a scrap of paper on which he had written the license plate number, color of the vehicle, and a brief description of the gunman. He said he was "a hundred percent sure" he had copied the license plate number accurately.

Sara and Rory were taken to a hospital where she submitted to a sexual assault evaluation by the on-call Sexual Assault Nurse Examiner. She complained about bleeding and rectal pain. Rory was able to identify defendant as the perpetrator from photographic arrays and in court.

A-1343-18

## The Investigation

Investigators learned a white Acura SUV bearing a similar license plate to the one Rory described was registered to E.S., a woman living in Easton, Pennsylvania. It matched the vehicle on the motel surveillance video. The car's owner testified at trial that she had lent the vehicle to defendant on several occasions, including on Easter weekend in 2012. She had never lent the car to anyone except defendant and her adult daughter. Defendant was arrested on April 16, 2012, when E.S. appeared, accompanied by defendant, to address a traffic summons in Springfield. E.S. consented to a search of the Acura. Inside, police found a bill bearing defendant's name and an Elizabeth address.

On that day, one victim from each incident—Maude, Alex, Jill, and Rory—all identified defendant from a photo array. Like all the other photo identifications, it was conducted by officers not involved in the investigation.

Two detectives interviewed another woman, S.F., who called Elizabeth police concerning the ongoing investigation. S.F. testified at trial that during the time span when the incidents occurred, she had been in a relationship with defendant. He kept clothes and other items at her home, including shoes, a suit, an extra phone, a leather jacket, and two pairs of jeans. S.F. recalled seeing defendant driving a white Acura with a Pennsylvania license plate.

A-1343-18

S.F. last saw defendant the morning of his arrest. When she had not heard from him for a couple of days, she called his mother, using the phone defendant had left at her home. Defendant's mother returned the call the following day, April 19, and asked if she could retrieve the black leather jacket and defendant's other "belongings." A couple of hours after that, she received a call from defendant's friend J.J. asking if he could come to collect defendant's things. J.J. testified that he made that call, along with calls to other women, at defendant's request. Defendant also tried to call S.F. that same night.

When S.F. checked the leather jacket, she found a black North Face hat rolled up in the right sleeve, and Maude's government-issued identification in one of the pockets. The hat had two holes cut out for eyes. S.F. also found Maude's pink laptop in a drawer. She gave the two Elizabeth detectives these items, and later that afternoon consented to a search. In the bottom drawer of S.F.'s oven, police found a handgun and magazine.

After DNA testing, defendant could not be excluded as the source of samples from the black leather jacket, handgun clip, black ski mask, or the sperm fraction from Maude's cervical swabs. The odds that an unrelated black male was the source of the DNA samples tested were one in 105 with respect to the collar of the jacket, one in 13 quadrillion with respect to the slide of the gun,

16

one in 8.5 quintillion with respect to the sperm fraction, and one in 7.4 sextillion with respect to the hat.

The State at trial submitted testimony and documentation to verify that the weapon found at S.F.'s residence, bearing DNA evidence identifying defendant, was operable. Furthermore, a search of state police records revealed that defendant did not have a firearms identification card or permit to purchase or carry a handgun. Now on appeal, defendant raises the following points:

POINT I

THE JUDGE IMPROPERLY DENIED DEFENSE COUNSEL'S REQUEST TO INCLUDE IN THE VOIR-DIRE QUESTIONS AN INQUIRY INTO THE EFFECT THE "ME TOO" MOVEMENT HAD ON POTENTIAL JURORS' VIEWS, PARTICULARLY IN LIGHT OF THE MOVEMENT'S MOTTO TO "BELIEVE" THOSE WHO ALLEGE SEXUAL ASSAULT.

POINT II

REVERSIBLE ERROR WAS COMMITTED WHEN THE JUDGE DENIED DEFENDANT'S SEVERANCE MOTION WITH RESPECT TO THE FIRST INCIDENT. ALTERNATIVELY, EVEN IF ALL OFFENSES WERE PROPERLY TRIED TOGETHER, A FAIR TRIAL SIMPLY COULD NOT BE HELD WITHOUT A LIMITING INSTRUCTION TO THE JURY REGARDING THE PERMITTED AND PROHIBITED USES OF ONE INCIDENT TO PROVE ANOTHER.

POINT III

THE PHASE-TWO TRIAL ON FOUR COUNTS OF "CERTAIN PERSONS" WEAPONS POSSESSION WAS TAINTED BY TWO RELATED ERRORS: DEFENDANT WAS DENIED THE EFFECTIVE REPRESENTATION OF COUNSEL WHEN HIS ATTORNEY LITERALLY DID NOTHING TO DEFEND THE PHASE-TWO CASE -- NO OPENING, NO CLOSING, NOTHING -- AND THE ATTORNEYS AND JUDGE BADLY MISCHARACTERIZED THE APPROPRIATE STIPULATION THAT CASE LAW ALLOWS REGARDING THE DEFENDANT'S PRIOR CONVICTION.

POINT IV

THE SENTENCE IMPOSED IS MANIFESTLY EXCESSIVE, AND SOME OF THE WEAPONS CONVICTIONS SHOULD HAVE MERGED.

I.

Defendant's first point of error is that the court erred by denying defense counsel's request to include an open-ended question concerning the Me Too Movement in the jury voir dire. This argument is so lacking in merit as to not warrant discussion in a written opinion. R. 2:11-3(e)(2).

To suggest that in a case where the proofs were as overwhelming as in this case—eyewitness identification by five victims from four separate events, surveillance film and other evidence tying defendant to the vehicle the

18                                                    A-1343-18

perpetrator drove from the scene, substantial DNA evidence including on the handgun that defendant hid in a girlfriend's apartment—that prospective jurors should have been asked about their views regarding the Me Too Movement borders on the frivolous. The judge's questions were probing, the model jury questions intended to ferret out potential bias. The voir dire process in this case ensured that jury selection produced a fair and impartial panel.

II.

With regard to severance, we affirm, relying in great part on the judge's statement of reasons. Rules 3:7-6 and 3:15-2(b) govern permissive and prejudicial joinder, respectively. Permissive joinder allows the State to charge multiple offenses in a single indictment "if the offenses . . . are of the same or similar character or are based on the same act or transaction or on [two] or more acts or transactions connected together . . . ." R. 3:7-6. If, however, "it appears that a defendant or the State is prejudiced by a permissible or mandatory joinder of offenses or of defendants in an indictment or accusation[,] the court may order an election or separate trials of counts . . . ." R. 3:15-2(b).

"Charges need not be identical to qualify as 'similar' for purposes of joinder under Rule 3:7-6." State v. Sterling, 215 N.J. 65, 91 (2013). Rather, "Rule 3:7-6 expressly permits joinder when there is some connection between

separate counts rendering the evidence probative of a material issue in another charge." Ibid.

To decide a motion to sever, a court must determine whether "assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible . . . in the trial of the remaining charges." State v. Pitts, 116 N.J. 580, 601-02 (1989). "If the evidence would be admissible at both trials, then the trial court may consolidate the charges because 'a defendant will not suffer any more prejudice in a joint trial than he would in separate trials.'" State v. Chenique-Puey, 145 N.J. 334, 341 (1996) (quoting State v. Coruzzi, 189 N.J. Super. 273, 299 (App. Div. 1983)). "Although joinder is favored, economy and efficiency interests do not override a defendant's right to a fair trial." Sterling, 215 N.J. at 72.

The joinder inquiry "begins with an assessment of whether there is similarity or a connection between charges because one involves evidence probative of another charge," but "[e]ven if that threshold is satisfied, the court remains obligated to assess for prejudice, which may require the granting of relief from joinder." Id. at 92. For that reason, in deciding severance issues, courts employ the four-part test pertaining to "other crimes" evidence under State v. Cofield, 127 N.J. 328, 338 (1992) and N.J.R.E. 404(b). Id. at 73.

Under N.J.R.E. 404(b), "evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition," but such evidence "may be admitted for other purposes . . . [if] relevant to a material issue in dispute."  In Cofield, 127 N.J. at 338, the Supreme Court established a four-prong "rule of general application in order to avoid the over-use of extrinsic evidence of other crimes or wrongs."  Those prongs are as follows:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Ibid.]

The admissibility of other-crime evidence "is most easily understood in situations of signature crimes, in which some distinct feature about the two crimes clearly allows the jury to make an inference other than propensity to commit crime."  Id. at 336.  The Court cited as an example that "the distinctive features of a silver pistol used in a prior crime would be admissible . . . in an

21

unrelated murder trial to establish either the identity of the perpetrator or the weapon used." Ibid.

Separate offenses may be linked "on the basis of modus operandi, or a signature way of committing the crime." Sterling, 215 N.J. at 93. Proponents of signature-crime analysis pertaining to "the manner in which [the] crimes were committed" must overcome a "high burden," however. Id. at 94, 97. "[T]he other crimes must bear peculiar, unique, or bizarre similarities" to be admissible to prove the identity of the perpetrator. State v. Fortin, 162 N.J. 517, 530 (2000). "Admission of evidence as supportive of a signature crime must remain a case-by-case analysis, assessing what it is about the method of a crime's commission that might make it a signature crime." Sterling, 215 N.J. at 97. "[C]ircumstantial evidence is key, and the unique common features among the crimes must be nearly identical." State v. Gillispie, 208 N.J. 59, 88 (2011).

Other-crime evidence admitted for the purpose of identity under N.J.R.E. 404(b) is not "limited to testimony of the defendant's participation in a similar or 'signature' crime." Id. at 86. Rather, evidence of a separate crime is also admissible to prove identity "when defendant's connection to the first crime was established by specific evidence discovered during the [later] crime." Sterling, 215 N.J. at 92. Similarly, "[i]f a defendant can be connected to a weapon or

disguise used in a prior criminal transaction, it can serve to identify him or tie him to a similar event." Gillispie, 208 N.J. at 86.

For example, in Gillispie, a murder prosecution, where ballistic evidence established that the same gun had been used in a separate shooting twenty days prior to the murder for which the defendants were being tried, and a witness had identified the defendant as the shooter in both cases, the Court held that "the fact that the same gun was used . . . was admissible to prove identity" in the case being tried. Id. at 90-91.

Similarly, in State v. Pierro, 355 N.J. Super. 109, 117 (App. Div. 2002), we upheld the joinder of separate home burglaries committed against separate houses four days apart where police found specific stolen goods from the first burglary when arresting defendant for the second burglary. See also State v. Loftin, 146 N.J. 295, 394 (1996) (holding failure to give a limiting instruction concerning defendant's post-murder credit card fraud in which he impersonated murder victim to establish defendant's identity as victim's murderer was not reversible).

As to modus operandi evidence sufficient to establish a signature way of committing a crime, in State v. Sempsey, 141 N.J. Super. 317, 323-24 (App. Div. 1976), involving a sexual assault and robbery trial, we upheld the

23

admissibility of the testimony of a woman who alleged that the accused had previously sexually assaulted and robbed her about five months prior to the charged offense. The panel noted that "[b]oth attacks occurred late at night . . . in [the victims'] apartments" and "[i]n both instances the eyes of the victims were taped" to conceal the identity of the attacker, who, in each case, "wore peculiar head gear, a dark jacket, and pants," carried a gun, and "upon leaving instructed the victims to count or he would shoot." Ibid. The victims in both instances also described their attacker as "smell[ing] of grease," and of coercing oral sex after not being able to obtain an erection. Id. at 324.

On the other hand, in Sterling, 215 N.J. at 82-83, the State had sought to try defendant for four separate criminal episodes against four different victims in one trial. Three sets of charges involved both home invasion burglaries and armed, aggravated sexual assaults, while the fourth set of charges involved burglary and unlawful possession of weapons arising from an aborted home invasion attempt. Id. at 81-82. The trial court had granted the defendant's motion to sever two of the sexual assault incidents from the third, but denied the motion to sever the other two from each other, and further held that the State could try the charges arising from the aborted home invasion incident in either

of the two trials and, if proven, could introduce that incident as other-crimes evidence in whichever case was tried second. Id. at 83.

After the defendant in Sterling was convicted in two trials of all charges, we vacated all of the convictions except the unlawful possession offense, holding that the separate incidents were not signature crimes and should not have been tried together, nor should the fourth incident have been admitted in either trial. Id. at 88-89. The Supreme Court affirmed, in part, holding that, despite "some similarities between the burglaries and sexual assaults . . . there [was] no uniqueness to the manner in which those crimes were committed," and "[t]he most significant signature elements" were the use of a condom, racial comments, and the cutting of the victims' undergarments with a knife. Id. at 97-98. The Court noted that there was nothing "unique, or ritualistic, in cutting off clothing" and that condom use was not a sufficiently unusual feature of a sexual assault to make these incidents signature crimes. Id. at 98. The Court further held that the separate crimes were only minimally probative on the issue of identity for which "[t]here was less-prejudicial[,] admissible evidence" available, including DNA and witness-identification testimony. Id. at 100.

The Sterling Court held that the error in joining the two sexual assault incidents in the first trial was harmless with respect to one of the incidents, due

A-1343-18

to the strong DNA and witness identification evidence in that case, but harmful with respect to the other sexual assault incident in which there was weaker DNA evidence and no witness identification. Id. at 103-05. The Court was unable to "disregard the distinct possibility" that the case with stronger evidence "influenced the jury in its assessment" of the other incident. Id. at 105. The Court also reinstated the aborted home invasion burglary conviction, holding that, similar to the reinstated burglary and sexual assault conviction, there was "overwhelming evidence of defendant's guilt," including two witness identifications. Id. at 106-07. However, the Court affirmed our decision to vacate the sexual assault and burglary convictions from the second trial, in which the aborted burglary had improperly been admitted as other-crime evidence for essentially the same reasons. Id. at 107-08.

Here, the trial judge's thirty-five-page written decision not only adequately addressed the law, it included specific factual findings regarding the strong similarities and links between defendant and all four of the incidents. As the judge noted, apart from the silver gun, in each incident the victims described their assailant as a black man of medium build with short hair wearing a black mask and black leather jacket.

26

The manner of the commission of the offense was the same in every case, including the staging of the aggravated sexual assaults. Each incident was thus probative other crimes evidence as to the others.

The judge reasonably denied defendant's motion to reconsider his decision, as the differences between the first incident and the subsequent events were inconsequential. Insofar as defendant's argument that the first incident, in which the assailant made comments regarding Walt's nephew, should be treated as separate and apart, the judge noted that defendant would have ample opportunity to question Walt.

Reviewing the judge's decision under an abuse of discretion standard, see Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021), no abuse of discretion occurred. Not only did the judge support his decision based on factual and legal precedents, even a superficial reading of the description of the four incidents suffices to reveal remarkable similarities among them. The geographic proximity of the crimes and the ages of the female victims only added to their similarity.

These crimes were committed within the span of a few weeks, and clear and convincing evidence, including eyewitness testimony, was available to establish each. The manner in which the crimes were committed amounted to a

27

virtual "modus operandi, or a signature way of committing the crime." Sterling, 215 N.J. at 93. Although certainly the evidence of these crimes was prejudicial, "it was prejudicial in the way that all highly probative evidence is . . . because it tends to prove a material issue in dispute." State v. Rose, 206 N.J. 141, 164 (2011).

Additionally, defendant contends that the court should have, but did not, read the jury Model Jury Charges (Criminal), "Proof of Other Crimes, Wrongs, or Acts (N.J.R.E. 404(b))" (rev. Sept. 12, 2016). Defense counsel did not seek such an instruction; thus we review the absence of the charge employing the plain error standard. See R. 2:10-2. Any error will be disregarded unless clearly capable of producing an unjust result.

The trial court gave a multiple charges instruction. See Model Jury Instructions (Criminal), "Criminal Final Charge, Multiple Charges" (rev. May 5, 2014). A court's instruction to the jury that it must find the defendant guilty of each individual count suffices. State v. Pitts, 116 N.J. 580, 603 (1989). It is preferable for the court to "emphasize[] to the jury its duty to avoid any negative or prejudicial impressions that might otherwise be created by the joinder of several criminal charges in a single indictment." Ibid. However, while joinder and other crimes evidence are scrutinized pursuant to Rule 404(b), the jury

instructions mirroring that analysis are not required. State v. Alfano, 305 N.J. Super. 178, 192 (App. Div. 1997). As the court delivered the model jury instruction for multiple charges, there was no error.

Generally, when other crimes evidence is admitted, the relevant jury instruction should be included in the final charge. The judge in this case did not do so, however, he did state that, in accord with the model jury charge, "defendant is entitled to have each count considered separately by the evidence which is relevant and material to that particular charge . . . ." That instruction, which we assume the jury followed, makes a similar point. See State v. Herbert, 457 N.J. Super. 490, 508 (App. Div. 2019).

There is no basis to conclude that the absence of the instruction prejudiced defendant. The jury deliberated for three days, requesting several readbacks in the process. That despite the State's overwhelming proofs the jury considered the matter for a lengthy period of time speaks to their commitment to decide it as explained to them by the judge, considering each of many counts "by the evidence which is relevant and material to the particular charge." The court did not abuse its discretion, nor was the outcome of the trial unjust as a result of severance or the lack of the proof of other crimes instruction.

## III.

Defendant contends his counsel was entirely ineffective in the representation afforded to him during the second trial on the unlawful possession of a weapon, and that the stipulation which was read to the jury improperly identified the nature of defendant's predicate conviction. Counsel did not make an opening or closing statement, did not call any witnesses, and defendant claims essentially did nothing.

Trials on certain persons not to possess charges pose a particular challenge. As the Court observed in State v. Ragland, 105 N.J. 189, 194 (1986), there is a significant risk that these trials become "a charade," due to the risk the jury will find the possession element automatically after having found it in the first trial. The judge, in compliance with Ragland, at the beginning of this trial, instructed the jury to disregard their prior verdict and hold the State to the beyond a reasonable doubt standard of proof. The court presented counsel with an unobjected-to stipulation, indicating that the predicate offense was defendant's prior conviction for possession of a weapon for an unlawful purpose. The stipulation further explained that defendant's conviction barred him by statute from possession of a weapon.

30

Ineffective-assistance-of-counsel claims are ordinarily not addressed on direct appeal. State v. Preciose, 129 N.J. 451, 460 (1992). In this case, counsel may have had some strategy not explained on the record. Therefore, we do not decide the claim now, but defer it to defendant's filing of an application for post-conviction relief, if he chooses to do so. See State v. Hooper, 459 N.J. Super. 157, 174-75 (App. Div. 2019).

IV.

Defendant contends, first, that his sentence was excessive, and next, that the weapons possession convictions should have merged. The latter contention is one with which the State agrees. The State adds, however, that the court should have imposed a term of parole ineligibility for the convictions of possession of a handgun without a permit. We agree.[2]

The court shall resentence defendant on only one weapons possession conviction with the appropriate term of parole ineligibility. The four counts of certain persons not to possess, the convictions flowing from the second trial, should also merge. Defendant should be sentenced on only one certain persons not to possess offense.

---

[2] Pursuant to State v. Reid, 456 N.J. Super. 44, 68-70 (App. Div. 2018), an option can be offered to the jury to find defendant guilty of only one possessory offense. The jury was not asked any specific questions with regard to the gun.

Because we agree that the Graves Act, N.J.S.A. 2C:43-6(c), applied, we remand for the court to resentence defendant to a term of parole ineligibility. The court's failure to impose a Graves Act term of parole ineligibility makes this an illegal sentence which can be corrected at any time, including after defendant begins service of the terms. See State v. Moore, 377 N.J. Super. 445, 450 (App. Div. 2005). The Graves Act provides that a person who has been convicted of possession of a handgun while in the course of committing or attempting to commit a crime must be sentenced thereunder, the minimum term to be fixed at one-half of the sentence or forty-two months, whichever is greater. On remand then, in addition to merging the four unlawful possession of a weapon convictions and the four certain persons convictions, the court shall resentence defendant pursuant to the Graves Act.

Defendant also contends that the court's sentence was excessive. "Whether a sentence should gravitate toward the upper or lower end of the range depends on a balancing of the relevant factors" under N.J.S.A. 2C:44-1(a) and (b). State v. Case, 220 N.J. 49, 64 (2014). The court's determination of the statutory range for each degree of offense is based on the aggravating and mitigating factors found in our Code. Those findings, although discretionary,

must be "grounded in competent, reasonably credible evidence." State v. Roth, 95 N.J. 334, 363 (1984).

We find no merit to defendant's claim either that the length of the sentences was excessive, or that the court inappropriately balanced the factors set forth in State v. Yarbough, 100 N.J. 627, 643-44 (1985). See State v. Torres, ___ N.J. ___, ___ (2021) (slip op. at 21).

The court found aggravating factors one, three, six, and nine, and no factors in mitigation. N.J.S.A. 2C:44-1(a)(1), (3), (6), (9). Defendant's argument that the judge did not thoroughly analyze each factor relying upon credible evidence is contradicted by the record.

The judge also adequately explained his reasons for imposing concurrent and consecutive sentences. See State v. Cuff, 239 N.J. 321, 348 (2019). He ordered the robbery and weapons possession convictions for each criminal episode to run concurrently to the aggravated sexual assault convictions pertaining to that episode, but that each separate aggravated sexual assault conviction would run consecutively. In explaining the reason to impose consecutive sentences for each separate aggravated sexual assault conviction, the judge held that each criminal episode concerned "separate and distinct assaults" against separate victims at different times and places. Within each

33

episode, "each individual victim was traumatized independent of . . . what happened to their companion," and that running the sentences for the crimes against the males within each episode concurrent to the sentences for the crimes against the females would be akin to treating the male victims "as if they did not exist." These were "separate acts of violence or threats of violence against each victim," that resulted in "distinct and separate . . . trauma visited upon each of the individual eight victims." In addition to the sexual assault perpetrated on the male victims, each was forced at gunpoint into a bathroom where they endured listening to violent sexual crimes committed against their female companions, while "not knowing if that unspeakable sexual hell was going to culminate in death." The judge's logic is unassailable.

The eight possessory offenses merge into two separate crimes. We see no impropriety in it being imposed consecutive to the others but leave that decision to the trial judge. The overall sentence, exclusive of the weapons sentences, does not shock our collective conscience.

V.

Defendant contends in his uncounseled brief that the manner in which Rory selected his photograph from an array was prejudicial and unduly suggestive. We do not agree. Although the trial court granted an evidentiary

34

hearing to take testimony from Rory concerning the estimator variables indicating reliability of the identification, see State v. Henderson, 208 N.J. 208, 293 (2011), the court stopped the hearing and ruled it was "clear as day" that Rory "was never told who to select." The court specifically found none of the estimator variables affected the reliability of Rory's pretrial identification. See id. at 291-92. Given Rory's viewing of defendant's face prior and during the incident, this is not surprising. See ibid. Nothing in this case indicates any substantial likelihood of irreparable misidentification.

VI.

Defendant also contends that Jalen's testimony, while he was in handcuffs, was unduly prejudicial. There is simply no factual basis to connect Jalen's incarceration, which was explored while he was on the stand, and the fact he was in handcuffs, with defendant's legal culpability for that particular incident. This could not have created an error clearly capable of producing an unjust result. See R. 2:10-2.

VII.

Finally, defendant contends in his uncounseled brief that the cumulative effect of errors warrants a new trial. We find, other than as to the merger and

Graves Act issues, that there were no errors, thus no cumulative error could have occurred.

Affirmed, except we remand for merger of the weapons offenses and imposition of a Graves Act term. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1343-18