**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1401-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CHARLES M. GRANT,
a/k/a CHARLES M. GRANT
DUMAS, CHARLES GRANT,
III, and CHARLES DUMAS,

    Defendant-Appellant.

_____

Argued January 12, 2022 – Decided February 15, 2022

Before Judges Hoffman, Whipple and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 15-12-1007.

Zachary G. Markarian, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Zachary G. Markarian, of counsel and on the briefs).

Ali Y. Ozbek, Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County

Prosecutor, attorney; Ali Y. Ozbek, of counsel and on
the brief).

PER CURIAM

Defendant Charles M. Grant was found guilty by a jury of first-degree purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(1) and (2), second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a), and unlawful possession of a firearm, N.J.S.A. 2C:39-5(b). He appeals from his conviction and life sentence.

Isaac "Blaze" Tucker was fatally shot at close range in the middle of the night on a street in Paterson. There were no witnesses. The only direct evidence presented against defendant was surveillance videos that recorded the shooting and tracked Tucker with another person walking to the location of the shooting, and the testimony of Tucker's friend, Demetrius Robinson, who claimed that defendant admitted to the murder days after it occurred.

On appeal, defendant claims that he was denied a fair trial because the court permitted the jury to view his videotaped interrogation, which included various statements from the interrogating officer that improperly opined on his credibility and guilt and that included other bad acts evidence (the murder of

John Doe[1]), which was inadmissible hearsay and violated defendant's confrontation clause rights. He also claims that he was denied a fair trial because after the jury advised the court that it was unable to reach a verdict, the court instructed it to continue deliberating without instructing the jurors that they should not compromise simply to reach a verdict. He claims that these errors standing alone, or cumulatively, require a new trial. He also challenges his sentence as manifestly excessive. We reverse and remand for retrial.

I.

We derive the following facts from the record. Shortly after 2:00 a.m. on February 23, 2015, Officer John Kelly of the Paterson Police Department (PPD) was dispatched to the residential area of Warren Street and East 16th Street in Paterson in response to an alert from a "ShotSpot" device that detects gun fire and alarms the police.

When Kelly arrived, he saw the body of a man, later identified as Isaac "Blaze" Tucker, lying in the middle of East 16th Street, just north of Warren and East 16th Streets. A broken bottle of Patron Tequila was lying next to

---

[1] The record does not reflect whether "John Doe" was the victim's street name, a phonetic spelling of his surname, a pseudonym, or used because the victim had not been identified.

A-1401-18

him.  Kelly approached to administer aid, but the man had already died.  He found five shell casings nearby.

PPD Detective James Maldonado collected surveillance video recordings from the area, which were played for the jury.[2]  Maldonado testified that based on those videos, he was able to determine where Tucker was and the route he traveled before he was shot.  Maps of the area, which are also not part of the record on appeal, were shown to the jury with markers designating the locations of the various cameras.

Maldonado testified that surveillance cameras at the Alto Rango Lounge and Liquor Store (the liquor store) located on 12th Avenue, recorded an image of the victim between 1:45 and 1:58 a.m.  The recording showed a man who wore a blue coat, a black hoodie, black pants, and a scarf inside the store.  During his interview, defendant identified himself as that man.  Defendant was unable to identify anyone else in the liquor store.

At 1:55 a.m., a video showed Tucker in the liquor store holding a bottle presumably of Patron Tequila.  At 1:58 a.m., he left the liquor store, walked west on 12th Avenue for approximately one block, and turned right onto East 16th Street.  While Maldonado did not describe in detail the images in the

---

[2]  The surveillance videos are not part of the record on appeal.

recordings, his testimony revealed that in at least one of the videos, Tucker was seen walking behind another person on 12th Avenue.

A surveillance video obtained from an electric company on East 16th Street, which was roughly a block past the corner of 12th Avenue and East 16th Street, showed Tucker and at least one other person walking north on East 16th Street, just past Governor Street. Another camera showed Tucker with a person beyond Governor Street. According to Maldonado, none of the videos showed Tucker talking to occupants of a car at Governor Street, or anyone turning onto Governor Street.

Another surveillance camera was located at a moving company further north on 16th Street, just before the corner of East 16th and Lafayette Streets. The camera depicted two individuals walking north on East 16th Street. A camera at East 16th and Lafayette Streets showed the same two individuals walking north on East 16th Street then stopping to talk to occupants in a vehicle that was heading south on East 16th Street. Apparently, another person appeared in the video, as the prosecutor asked Maldonado if he also saw "somebody approaching . . . from that direction," and Maldonado answered in the affirmative.

Approximately one block south of the shooting, a camera located on East 16th Street showed individuals walking north towards Warren Street. A

5

camera at Beef Town, located at the corner of East 16th and Putnam Streets, approximately one block north of the shooting, showed two individuals walking north on East 16th Street followed by "some flashes." Then one person, believed to be the shooter, walked north on East 16th Street and turned onto Putnam Street towards East 18th Street. One recording showed "the front" of the shooter.

On cross-examination of Maldonado, defense counsel displayed a "zoomed-in" still image of the gunman obtained from the camera at Beef Town and a still image of defendant from the liquor store, apparently to show that defendant's image did not match the gunman. Counsel also showed the image of a third person from the liquor store who wore a grey sweat suit. Maldonado testified that police had not identified the third person. Maldonado also agreed that the recording from the electric company near Governor Street showed "individuals" and that the camera at Beef Town recorded in color. During summation, defense counsel argued that the shooter wore "what appears to be gray, black and white" and that his pants were "wider" and his jacket "comes up higher" than the one defendant was wearing at the liquor store.

Demetrius Robinson identified defendant as "Charlie Wu" and said they had known each other for about a year. Robinson testified that on March 5, 2015, he and defendant were drinking at the location of the shooting, which

had been turned into a shrine for Tucker, who Robinson said had been his best friend. At one point, defendant spat on the shrine and kicked it. Robinson asked defendant what he was doing, and defendant told him to mind his own business, shoved him, pulled out a black "Glock," and pointed it at Robinson's face. Robinson swatted it away and ran down the street. As he ran, he heard defendant say that "he was going to kill [him] like he had killed Blaze."

Immediately thereafter, Robinson obtained a gun to protect himself. He was arrested with the gun the following day and, at the time of trial, serving a sentence of five years' imprisonment with a forty-two-month parole bar for unlawful possession of that gun. Robinson had prior drug offenses and was scheduled to "max out" on March 11th.

On cross-examination, Robinson stated that he pleaded guilty to the gun charge and faced a maximum prison term of ten years. He served half of his five-year term in prison and was then transferred to a half-way house. Robinson denied that he requested to speak with police after his arrest, claiming that police approached him while he was detained.

Maldonado testified that Robinson asked to speak with investigators after he was arrested. Maldonado denied making Robinson any promises but told Robinson that he would "see if [he] could help him out in any kind of

way." He then allowed Robinson to make a phone call to try to obtain bail money.

Defendant was arrested in Maryland on April 14, 2015. On April 16, 2015, PPD Detective Audrey Adams and Maldonado interviewed defendant after he waived his Miranda[3] rights.

Defendant told Maldonado and Adams that he had gone to Maryland to visit his children and he had known Tucker for about ten years. The last time he saw Tucker was on the night of the shooting when they were at the liquor store. A "few" others were also inside the liquor store. Maldonado showed defendant still images from the liquor store and asked him to identify various people, but he was only able to identify himself and Tucker.

Defendant said he and Tucker left the liquor store and walked "down 12th Ave towards" East 16th Street. Defendant turned left onto Governor Street and Tucker continued on East 16th Street, stopping to speak with someone in a car. The following day, defendant heard that Tucker had been shot and killed. Defendant denied that he had anything to do with the murder or carried a gun that night. When asked if he had shot Tucker to avenge the murder of his friend John Doe, who, according to rumors, Tucker had killed,

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

A-1401-18

defendant denied knowing who killed John Doe and denied that he had killed Tucker to avenge Doe's death.

A medical examiner testified that Tucker had four gunshot wounds, three to his chest and back, and one above his right eyelid. The bullet that entered his head was fired at close range, about one to two inches from his head.

Detective Sergeant Robert Sloma of the Bergen County Sheriff's Office, the State's expert in ballistics, testified that the shell casings found at the crime scene were fired from a 9 mm Glock. Detective Mike Cossari from Crime Scene Investigation (CSI) testified on cross-examination that defendant's fingerprints were not detected on the casings, or the Patron Tequila bottle found near Tucker's body. On redirect, he stated that in his fifteen years at CSI, he had never detected fingerprints on shell casings. Adams testified that defendant did not have a permit to carry a firearm.

A Passaic County grand jury indicted defendant on charges of knowing or purposeful murder of Isaac Tucker (count one), possession of a firearm for an unlawful purpose (count two), unlawful possession of a firearm without a permit (count three), and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b) (count four).

By order dated July 19, 2018, the court denied defendant's motion to suppress his videotaped statement. The court directed counsel to resolve

transcript redaction issues and to contact the court with any unresolved disputes.

During trial, defendant objected to the playing of his interview, claiming it included other bad acts evidence on "the shooting of John Doe." Without ruling on the admissibility of that evidence, the court stated that it would provide a limiting instruction, but then failed to do so.

During deliberations, the jury requested several playbacks of the interview and surveillance videos, and one juror was excused for illness after deliberating for one day. Less than two hours after the newly sworn jury began deliberating, it notified the court that it was unable to agree on a verdict. The court directed the jury to continue deliberations without instructing the jurors that they could reconsider their opinions so long as they did not surrender their honest convictions solely for the purpose of returning a verdict. Shortly thereafter, the jury found defendant guilty of counts one, two, and three. Count four charging the certain persons offense was dismissed.

Defendant filed a motion for a new trial based on the admission of Robinson's testimony, which is not an issue on appeal, and the insufficient instruction provided to the jury after it said it was unable to agree on a verdict. The court denied the motion, believing that the jury had voluntarily reached a unanimous verdict after considering all the evidence.

10

On November 2, 2018, the court sentenced defendant to an aggregate term of life imprisonment with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.  This appeal followed.

Defendant raises the following points for our consideration:

> POINT I
>
> GRANT WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL BY THE ADMISSION OF PORTIONS OF HIS INTERVIEW IN WHICH DETECTIVE MALDONADO REPEATEDLY INSISTED HE KNEW GRANT WAS LYING, EXPRESSED HIS LAY OPINION THAT VIDEO FOOTAGE CONTRADICTED GRANT, AND SPECULATED HOW A JURY WOULD PERCEIVE GRANT'S DEMEANOR AND THE STRENGTH OF THE STATE'S CASE.
>
> A. The Interrogation Video Played For the Jury.
>
> B.  Detective Maldonado's Statements Throughout the Interrogation Were Inadmissible and Highly Prejudicial Lay Opinion.
>
> C.  The Trial Court Failed to Provide the Jury With a Limiting Instruction That It Should Not Consider Detective Maldonado's Statements as Evidence of the Truth of the Matter Asserted.
>
> D.  The Erroneous Admission of Detective Maldonado's Extensive Lay Opinion Statements Was Not Harmless Because the State's Case Was Far From Overwhelming.

11

POINT II

THE TRIAL COURT ERRED IN ADMITTING PORTIONS OF GRANT'S INTERVIEW IN WHICH HE WAS QUESTIONED REGARDING A MURDER NOT BEFORE THE JURY.

POINT III

GRANT WAS DENIED THE RIGHT TO A FAIR TRIAL BY THE COURT'S COERCIVE INSTRUCTIONS IN RESPONSE TO THE JURY'S NOTE STATING THAT IS WAS UNABLE TO REACH A VERDICT.

POINT IV

THE CUMULATIVE EFFECT OF THE AFOREMENTIONED ERRORS DENIED MR. GRANT A FAIR TRIAL.

POINT V

GRANT'S SENTENCE IS EXCESSIVE BECAUSE THE COURT IMPROPERLY DOUBLE-COUNTED ELEMENTS OF THE OFFENSE IN AGGRAVATION AND FAILED TO FIND A PLAINLY APPLICABLE MITIGATING FACTOR.

> A. The Court Double-Counted Elements of the Offense in Finding Aggravating Factor [One] and Giving It "Heavy Weight."

> B. The Court Erred in Refusing to Find Mitigating Factor Eleven Solely Due to Grant's Outstanding Child Support Obligations.

12

II.

We first address defendant's argument, raised for the first time on appeal, that he was denied a fair trial because the trial court admitted portions of his interview where Maldonado offered lay opinions that infringed upon the jury's duty to decide credibility and guilt by saying: (1) he knew defendant was lying; (2) video recordings from the area contradicted defendant's story; (3) defendant had a gun on him just before the shooting; and (4) a jury would not believe his story and would want to know why he killed Tucker.

An evidential error that defendant did not object to at trial is reviewed for plain error. State v. Trinidad, 241 N.J. 425, 445 (2020). That standard requires reversal only if the testimony was "clearly capable of producing an unjust result." R. 2:10-2. The "possibility of an injustice" must be "'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" Trinidad, 241 N.J. at 445 (quoting State v. Macon, 57 N.J. 325, 336 (1971)). In deciding whether an error amounts to plain error, it "must be evaluated 'in light of the overall strength of the State's case.'" State v. Sanchez-Medina, 231 N.J. 452, 468 (2018) (quoting State v. Galicia, 210 N.J. 364, 388 (2012)).

N.J.R.E. 701 provides that "[i]f a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if

13

it: (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or in determining a fact in issue."

Significantly, Rule 701 "does not permit a witness to offer a lay opinion on a matter 'not within [the witness's] direct ken . . . and as to which the jury is as competent as he to form a conclusion[.]'" State v. McLean, 205 N.J. 438, 459 (2011) (alterations in original) (quoting Brindley v. Firemen's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955)). Stated another way, lay opinion testimony "is not a vehicle for offering the view of the witness about a series of facts that the jury can evaluate for itself or an opportunity to express a view on guilt or innocence." McLean, 205 N.J. at 462. In the context of police testimony, an officer may provide testimony about facts observed firsthand, but may not "convey information about what the officer 'believed,' 'thought' or 'suspected.'" Id. at 460 (citing State v. Nesbitt, 185 N.J. 504, 514-16 (2006)).

Here, defendant claims the State offered improper lay opinion testimony through Maldonado's statements during the interview, the first of which occurred after Maldonado asked defendant if he had "a piece on" him at the liquor store, and defendant denied carrying a gun, including on the night of the

shooting.  Maldonado responded: "you had a gun on you[,] . . . you probably had a gun on you.  Maybe you got a gun."[4]

After defendant stated that he and Tucker left the liquor store together then parted ways at Governor Street, Maldonado questioned defendant's story, telling him: "That's it.  I'll get straight to the point.  You don't stop at Governor Street, you know.  We got you going past Governor Street.  We got you going past Lafayette Street.  And that's when the car pulls up to you guys.  Who was in that car?"  Defendant said he did not know.  Maldonado continued:

> That's not -- and you told me you didn't go past -- why you didn't go past Governor Street for whatever reason.  But you say -- (indiscernible) Lafayette Street in the city here and -- (indiscernible), you know.  You see Blaze walk.  And you tracked him down . . . there.  As you're tracking past, we look to see that a car pulls up to you guys.  And you guys start talking to some people in the car.  And so for some reason, you went past.  So either something happened right there, or, you know, for some reason you're holding back on -- (indiscernible).  Come on, dude.  Let's do the right thing here.

Defendant replied that he was trying to do the right thing.

Maldonado insisted that defendant "had a problem with" Tucker and told defendant: "You thought he was going to do something to you."  Defendant

_____

[4]  We note that the transcript of the interview contains many indiscernible references at this point.

A-1401-18

disputed both contentions. Maldonado persisted: "Were you talking some smack about him? . . . Thinking he was going to do something to you? Was he trying to lure you somewhere?" Defendant denied having any problem with Tucker.

Maldonado then asked: "So what happened when you go past Lafayette Street?" Defendant replied: "I wasn't on Lafayette Street."

> DETECTIVE MALDONADO: Uh-huh. So you remember -- (indiscernible) Governor Street?
>
> GRANT: No.
>
> DETECTIVE MALDONADO: No? But it's the same two guys walking. Same two guys leave the bar. The same two guys walking all the way down. You know, two things. You either shot Blaze.
>
> GRANT: I didn't kill him.
>
> DETECTIVE MALDONADO: Or with a gun[,] shot Blaze, or you know something else that happened that you're not telling us. So two -- two things that could have happened.

Defendant's reply was indiscernible.

Maldonado continued: "Something could have been triggered --" and defendant replied: "No." Maldonado then said: "I know something happened and you're telling us that you don't want to tell us." Maldonado asked if defendant had been motivated by greed or money. Maldonado urged defendant

A-1401-18

to help himself by confessing and explaining his motive. Maldonado then claimed the jury would not believe his denials and said:

> And then they [the jury] look at those videos of you walking all the way to almost to where you got there. And then what are you hiding? I mean, not just if you killed him or something else. It's what are you hiding? That alone, what are you hiding -- (indiscernible), you know.
>
> You know a jury's not made up of people from the hood and be like, you know. You know, people want reasons . . . And if you said no -- (indiscernible) deceiving like that, and that they're hiding something. You know, got a stone cold killer, somebody that he calls buddy, he just fucking blasted him and left him there. Left him there to die, you know.
>
> . . . The jury wants to know. People want to know. That's their thing to know why something happened. I mean, you gave us the truth to a certain point. Which I understand -- (indiscernible). . . . But, you know, I'm not -- (indiscernible) that last part of the story. And that's where you said the part -- (indiscernible) a stone cold killer that's what that this . . .
>
> I know -- (indiscernible) -- blast something for something, you know. But (indiscernible) there's a reason behind it. And when you carry a gun -- (indiscernible) -- you see the frigging gun. You got to think about it. (Indiscernible).

Defendant's reply was indiscernible.

Maldonado continued:

> You can tell by the videos of the park you had a gun on you . . . . You can see the imprint on your jacket . .

17

A-1401-18

. . You definitely see the imprint of the gun . . . . It can't be anything else. . . . [W]e know you had a gun that night. And we know you carried a gun before.

. . . .

And I know you walked away all the way down. We've got proof. I know that. We've got you right on video walking -- (indiscernible). There's cameras there, man. You know about the city camera and you see everything . . . .

Like I know about the car. I know about the car that pulls up -- (indiscernible) passing. (Indiscernible) and you keep walking on 16th, a car pulls up, and you guys talking on the street. And we see the car pull off, and we see you guys walk away. (Indiscernible) just go about your way.

. . . .

I'm not going to make something up that's not true for you and (indiscernible) full of sh**, you know. (Indiscernible) park over there, you know. So how would I know that? There's cameras there, you know. We tracked everything down from the bar all the way around, you know. We know you walked out of the building. You went out to the street.

So you're going to tell us it wasn't you that passed Governor Street. (Indiscernible) -- clothes is very, you know, very distinguished, you know. You didn't have just all black, you know. You had a little thing with pockets, with a -- (indiscernible) and a scarf over your face and over your head, you know. It's not like it wasn't distinct anything that, you know, like say it could be anybody in that bar, you know. You had something on, and the video shows everything you had on -- (indiscernible) to that. Okay? So everybody don't dress alike, and, you know.

18

A-1401-18

You got with him. You're the one who walked with him. And farther, we see the car up on -- (indiscernible) you guys start talking to some people in the car. And the car goes off and keep going up. And what happened?

Defendant replied: "That's all I know . . . I told you I went up Governor Street." Maldonado continued:

You didn't go up Governor Street. . . . We know you did it, because that day at the bar you walked out with Blaze. . . . The day Blaze died you walked out with him, and you walked all the way to -- (indiscernible). Yeah. You can tell (indiscernible) Governor Street, but I'm telling you we know you did. A hundred percent.

Defendant replied: "So are you going to charge me for something I didn't do?"

Maldonado said: "You're not giving me nothing else other tha[n] we know you went back to Governor Street with him, you know. We see the car pull up. A couple blocks already -- (indiscernible)." Defendant replied: "That's all I know." Maldonado responded:

Okay. So when all that evidence is in front of you, and then you see all that -- you see yourself walking with him all the way -- (indiscernible). Then you went on Governor Street. Knowing that it's all there, everything is there. Everybody's seen you continue to walk up. You're going to say what? You're going to lie to the jury to their face and the Judge right there while they're looking at everything you're doing and say that's not me? You're going to -- (indiscernible) on their face that they're stupid, and say that wasn't

19

me.  I can tell if you're lying.  I -- (indiscernible) look at you.

Defendant denied involvement, and Maldonado asked if he knew "how people look at [him]."  Then Maldonado said:

> When I see pictures of Blaze, and the way he's f\*\*king [blasted] and -- (indiscernible).  What do you think they're going to say?  He didn't even have an open casket, did he?  And to be done dirty the way he done -- he was, that sounds really bad right now.  But you can't even explain why this happened, you know.  It looks like a hit with the way it happened.
>
> It wasn't one of those where you were in the bar, and you shot.  And, you know, you shot somebody by mistake.  Somebody died.  And people are going to look at that, and they're going to think it's f\*\*ked up, you know.  Not even looking at, you know, there was this, it's personal, you know.  And they see that.  And you can see it as personal the way it happened.  And the last person with him is you.
>
> When they see all that evidence, the video and all that stuff -- (indiscernible) all that evidence they have there's no[] way -- happen to you.  And that whether it was right or it was wrong, the way he [was] shot from beside close range -- (indiscernible).  (Indiscernible) -- bounce this off of you to see -- (indiscernible) yourself.
>
> . . .
>
> That's the whole thing is why?  Not if you killed him.  But why did you kill him?
>
> . . .

A-1401-18

But once everything comes out, they're going to know you killed him.

After the questioning briefly turned to the subject of the John Doe murder, which we address infra, Maldonado asked: "So who killed Blaze? Dude, you were there?" Defendant said: "I don't know" and Maldonado responded:

> You were there. I know 100 percent you were there --
> (indiscernible). I'm telling you. I'm not buying or I'm
> not tricking you into telling me that you were there. I
> know you were there. That's the whole point. I knew
> you were there when Blaze got killed. I know you had
> a gun. The gun -- (indiscernible).

Defendant insisted that he did not have a gun, and Maldonado replied: "I don't think there's a phone that big that looks like a gun." The interview concluded with Maldonado's saying that defendant's story was "bulls**t" and "You know I understand."

At the end of Adams's testimony, which was the vehicle by which the entire unredacted interview was offered in evidence, the court instructed the jury on assessing the credibility of defendant's statement, but it provided no curative instruction regarding Maldonado's statements during the interrogation.

On appeal, defendant argues he was denied a fair trial because Maldonado stated: he knew defendant was lying and that he carried a gun and did not turn onto Governor Street; surveillance recordings contradicted

21

defendant's story; and the jury would not believe his denials and would want to know why he killed Tucker. Defendant contends the State would not have been permitted to offer this information through Maldonado's direct testimony and that it was not admissible by playing the interview to the jury. Defendant asserts that the lay opinions Maldonado expressed during the interview should have been redacted.

Defendant underscores that the court gave no instruction, at any time, explaining that Maldonado's opinions were not sworn statements and were not offered for the truth of the matters asserted. Defendant highlights that during deliberations the jury requested multiple playbacks of the interview. He contends that there is a strong chance the jury improperly credited Maldonado's statements based on his status as a police officer, particularly since Maldonado said he was "100 percent" sure that defendant committed the crime and that the jury would wonder what defendant was hiding after they viewed all the evidence.

Defendant also claims the prosecutor's summation compounded the error when the prosecutor argued that Maldonado knew defendant was lying.

Defendant contends these errors were not harmless because the State's evidence was not overwhelming, but rather, turned on Robinson's credibility and the surveillance videos. He argues that Robinson's story was self-serving

since he had a prior record and was facing gun charges when he requested to speak with police and implicated defendant. And he notes that the jury requested multiple playbacks of the surveillance videos and claimed it had been unable to reach a verdict before the court urged it to continue deliberating without providing an appropriate instruction.

The State responds that Maldonado's statements were proper interrogation techniques, and argues that because no New Jersey decision directly precluded his statements from being presented to the jury in the form of interrogation statements, the court did not err in permitting them.

Maldonado's disputed statements should have been redacted. They constituted improper lay opinions that invaded the jury's sole responsibility to decide the facts and guilt and improperly suggested that defendant had an obligation to explain himself.

Opinion testimony "is not a vehicle for offering the view of the witness about a series of facts that the jury can evaluate for itself or an opportunity to express a view on guilt or innocence." McLean, 205 N.J. at 462. As we explained in State v. Tung:

> Police testimony concerning a defendant's guilt or veracity is particularly prejudicial because "[a] jury may be inclined to accord special respect to such a witness," and where that witness's testimony goes "to the heart of the case," deference by the jury could lead

23

it to "ascribe[] almost determinative significance to [the officer's] opinion."

[460 N.J. Super. 75, 102 (App. Div. 2019) (internal citations omitted).]

Maldonado's statements that defendant could be seen in the videos carrying a gun and that the image of the shooter matched the image of defendant were lay opinions interpreting the evidence, a function solely entrusted to the jury. As our Supreme Court has explained:

We go to extraordinary lengths in ordinary criminal cases to preserve the integrity and neutrality of jury deliberations, to avoid inadvertently encouraging a jury prematurely to think of a defendant as guilty, to assure the complete opportunity of the jury alone to determine guilt, to prevent the court or the State from expressing an opinion of defendant's guilt, and to require the jury to determine under proper charges no matter how obvious guilt may be. A failure to abide by and honor these strictures fatally weakens the role of the jury, depriving a defendant of the right to trial by jury.

[State v. Frisby, 174 N.J. 583, 594 (2002) (quoting State v. Hightower, 120 N.J. 378, 427-28 (1990) (Handler, J., concurring in part and dissenting in part)).]

Maldonado opined during the interview that the videos clearly showed defendant had a gun and was the shooter. These were questions for the jury to decide. They should have been redacted. Had the State offered these statements on direct examination, they would have been excluded as improper

24

A-1401-18

lay opinion testimony because they amounted to "an expression of a belief in defendant's guilt" and they gave "an opinion on matters that were not beyond the understanding of the jury[,]" as the jury could view the evidence itself and determine whether defendant had a gun and was the shooter. McLean, 205 N.J. at 463; see also Tung, 460 N.J. Super. at 101 (explaining that a police officer's opinion testimony "as to defendant's truthfulness and guilt . . . were not admissible as either demeanor evidence or lay opinion" and invaded the jury's "exclusive responsibility" to determine credibility and guilt).

While these statements may be viewed as proper interrogation techniques, they were not proper statements to present to the jury. Although police may use psychological methods such as trickery and deception in attempting to obtain a confession, to be admissible at trial, statements by an interrogating detective must still comply with the rules of evidence and not deny the defendant the right to a fair trial. State v. Patton, 362 N.J. Super. 16, 31-36, 38-39 (App. Div. 2003). In Patton, we discussed the risk of a fabricated document used during interrogation making its way into the record, jeopardizing the right to a fair trial, and the requirement that hearsay embedded in an interrogation be excluded from evidence. Id. at 33-35, 38-39.

Maldonado's statements were particularly troublesome because they interpreted what was depicted on the videos as undeniable proof that defendant

had a gun and was guilty of fatally shooting Tucker. Maldonado's statements included that he was "100 percent sure" defendant killed Tucker. He called defendant a "stone cold killer" and said that he could tell that defendant was lying. These highly inflammatory statements invaded the province of the jury and improperly suggested that no jury would return a not guilty verdict. They also impinged on defendant's Fifth Amendment right to avoid self-incrimination.

Moreover, Maldonado's statements suggested that he had some superior knowledge of what occurred. "There is no provision in our legal system for a 'truth-teller' who is authorized to advise the jury on the basis of ex parte investigations what the facts are and that the defendant's story is a lie." State v. Pasterick, 285 N.J. Super. 607, 620 (App. Div. 1995). Similarly, a police officer may not claim or imply that he has "specialized training [that] enabled him to determine that defendant was lying." State v. C.W.H., 465 N.J. Super. 574, 594 (App. Div. 2021) (quoting Tung, 460 N.J. Super. at 103). Maldonado's opinions did just that. The error was compounded by the prosecutor's summation, which asserted that Maldonado knew that defendant was lying based on the evidence he saw.

Adding to the risk that Maldonado's statements led the jury to returning a verdict it may not have otherwise reached is the lack of any limiting

instruction on the use of Maldonado's statements. "Our Supreme Court 'has consistently stressed the importance of immediacy and specificity when trial judges provide curative instructions to alleviate potential prejudice to a defendant from inadmissible evidence that has seeped into a trial.'" C.W.H., 465 N.J. Super. at 595 (quoting State v. Vallejo, 198 N.J. 122, 135 (2009)). Here, the court provided no guidance on Maldonado's lay opinions, particularly his claims that he knew defendant had a gun and shot Tucker, the ultimate issues in the case.

Considered collectively, Maldonado's statements denied defendant a fair trial by invading the province of the jury to determine credibility and decide guilt, and improperly suggested that defendant had an obligation to explain himself to the jury. Because the evidence against defendant was not overwhelming and hinged on Robinson's credibility, which was subject to attack, and the poor quality of the surveillance videos, the errors were not harmless and denied defendant a fair trial. We reverse defendant's conviction and remand for a new trial.

## III.

Defendant further contends that the failure to redact Maldonado's questioning during the interview about the John Doe murder denied him a fair trial because: (1) it was inadmissible prior bad acts evidence that should have

27

been excluded under N.J.R.E. 404(b); and (2) referred to "rumors" and claims by others, in violation of the Confrontation Clause. Defendant claims that the court's instruction on assessing the credibility of his interview statements exacerbated the error because it did not instruct the jury on the impermissible uses of the John Doe murder.[5]

A court reviews an evidentiary ruling under the abuse of discretion standard but affords no deference to questions of law, including those that involve constitutional rights. State v. McInerney, 450 N.J. Super. 509, 512 (App. Div. 2017). Under the abuse of discretion standard, the reviewing court will not disturb the trial court's ruling unless it "was so wide of the mark that a manifest denial of justice resulted." State v. Perry, 225 N.J. 222, 232 (2016) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). Where admission of evidence under a hearsay exception violates the Confrontation Clause, the evidence must be excluded. State v. Branch, 182 N.J. 338, 369-70 (2005).

N.J.R.E. 404(b), which governs the admissibility of other crimes or bad acts evidence, provides:

> (1) Prohibited Uses. Except as otherwise provided by Rule 608(b), evidence of other crimes,

---

[5] Defendant partially raised this claim at trial by arguing that references to the John Doe murder should have been redacted. The court did not decide this issue.

wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition.

(2) Permitted Uses.  This evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute.

When evidence is admitted for a permissible use under N.J.R.E. 404(b), such as to establish motive, it "must be appropriately sanitized," so that the harmful evidence is limited to that which is necessary to establish the point. State v. Gillispie, 208 N.J. 59, 92 (2011).  Further, the court must provide "a firm and clear jury instruction" on the permissible use of the evidence.  Ibid.

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution afford an accused in a criminal case the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10.  These provisions "express a clear preference for the taking of testimony subject to cross-examination."  State v. Cabbell, 207 N.J. 311, 328 (2011).

"One of the essential purposes of cross-examination is to test the reliability of testimony given on direct-examination."  State v. Feaster, 184 N.J. 235, 248 (2005) (citations omitted).  Indeed, "[w]hen a witness's direct testimony concerns a matter at the heart of a defendant's case, the court should strike that

29

testimony if the witness" is unavailable for cross-examination before the same factfinder.  See ibid. (citations omitted).

[Id. at 328-29 (alterations in original).]

The Confrontation Clause prohibits the use of out-of-court testimonial statements when the defendant did not have the opportunity to cross-examine the witness on the statement.  In the Interest of J.A., 195 N.J. 324, 336, 351 (2008) (discussing Crawford v. Washington, 541 U.S. 36, 51-52 (2004)).  Statements obtained by police for the purpose of furthering a criminal investigation are testimonial for purposes of the Confrontation Clause.  Id. at 345 (discussing Davis v. Washington, 547 U.S. 813, 822 (2006)).  "The government bears the burden of proving the constitutional admissibility of a statement in response to a Confrontation Clause challenge."  State v. Basil, 202 N.J. 570, 596 (2010).

Shortly after the interview began, Maldonado asked defendant: "Back when . . . John Doe was killed, did you and him have [some] kind of a discussion --."  Defendant replied: "No. . . . [He] was feeling like he had something to do with it, but I don't know what the f**k was going on."  Maldonado responded: "You weren't there? . . . Because a lot of people say you and him had kind of a discussion, that you were a little upset with him, and then –[.]"

Defense counsel objected, stating that he believed the references to the John Doe murder were going to be redacted. The prosecutor contended the police were "exploring motive." "[T]he questioning is not about the defendant having to do anything with that shooting or anything. But having a problem with the victim over John Doe --."

The court asked defense counsel what he wanted the court to do and defense counsel requested a limiting instruction as to the John Doe murder reference. The court said it would give one, but the instruction was not given until the end of Adams's testimony, and the instruction only discussed assessing the credibility of defendant's statement while noting that defendant had denied any knowledge of John Doe's murder. The instruction did not provide any guidance on motive or on the prohibited and permissible use of Maldonado's interview statements and questions.

After the objection, the interrogation video began with the following question on the John Doe murder: "[T]he rumor was that supposedly they were saying he gave the dude the gun to shoot John Doe or something?" Defendant denied knowing anything about it. The questioning continued:

DETECTIVE MALDONADO: You never heard?

GRANT: I don't know the --

31 A-1401-18

DETECTIVE MALDONADO: Not that he purchased it. He gave him the gun. But there was a problem, and he squashed it, then he gave the dude the gun back.

GRANT: No. I never heard that.

          . . . .

DETECTIVE MALDONADO: You're not really helpful. Anything you want to tell me since you and John Doe was tight?

GRANT: I wasn't tight with him. I knew him. I knew his father. I didn't really hang out with him.

Later, Maldonado asked: "Were you avenging John Doe's death?"

Defendant answered: "No." The interrogation continued:

DETECTIVE MALDONADO: (Indiscernible) -- so mad inside that he's dead, you think he did something to John Doe, and he didn't want to give up who it was, and that was -- (indiscernible) block?

GRANT: No.

DETECTIVE MALDONADO: Because the guy that killed John Doe was somebody that he knew out there?

GRANT: No.

DETECTIVE MALDONADO: And you heard the story that he gave Blue (phonetic) back the gun, and you were in a fight?

GRANT: You telling me I killed Blue?

32

DETECTIVE MALDONADO: You know about that. That ain't nothing to know. If I know -- if I know, you must have heard that story 20 times. Trust me, the street told you who. . . .

GRANT: I hear –

DETECTIVE MALDONADO: There's no way possible that -- (indiscernible).

. . . .

DETECTIVE MALDONADO: Especially if he from there. And you (indiscernible) what happened there and all (indiscernible). There's no way you didn't hear that. Okay? And that -- (indiscernible) stress -- (indiscernible). I know you knew that. And I know you guys were upset. I was reading, you know. So this boy he think he did something that he should have done another way. And I think he had to. So f**k it. It is what it is, you know. So that's the reason why they do.

After Adams completed her direct testimony, the court provided instruction on assessing the credibility of defendant's statements. With respect to the John Doe murder, the court stated:

> During the interview, there was a discussion with regard to another incident of a shooting involving John Doe and the victim Isaac Tucker or Blaze. And defendant denied any knowledge of that incident.
>
> In considering whether or not the statements -- statement is credible, you should take into . . . consideration the circumstances and the facts as to how the statement was made, as well as all other evidence in this case relating to this case.

A-1401-18

> If, after consideration of all of these factors, you determine that the statements were . . . not actually made, or that the statements are not credible, then you must disregard the statement completely. If you find the statement was made, and that part or all of the statements are credible, you may give what weight you think appropriate to the portion of the statements you find to be truthful and credible.

The State now contends that the reference to rumors did not amount to hearsay because it was not offered for the truth of the matter asserted, but rather to test defendant's denials. Moreover, it claims that because the prosecutor argued in summation that motive was not known and was only a secondary issue that the State had no burden to prove, the summation "served as the ultimate in curative instructions."

The court issued no decision on the admissibility of Maldonado's reference to the John Doe murder as evidence of motive. As defendant argues, the State did not make motive part of its case. The State made no mention of motive in its opening statement, presented no other evidence of motive during trial, and claimed in summation that motive was unknown and not a matter that the State had to prove. Thus, even if the statements related to motive, this theory was not presented to the jury by the State.

In addition, even if the references to the John Doe murder were admissible under Rule 404(b), the court did not inform the jury of the limited permitted use of such evidence.

Further, based on the current record, it is unclear whether Maldonado's reference to rumors and information he heard from the street about the John Doe murder were testimonial. If they were made to further a police investigation, they would qualify as testimonial, In the Interest of J.A., 195 N.J. at 345, and be subject to the Confrontation Clause.

Maldonado's statements relating to the John Doe murder denied defendant a fair trial because they amounted to prior bad acts evidence that were admitted without any jury instruction on their limited permissible use and included imbedded hearsay that arguably infringed on defendant's right to confront witnesses. The court should have conducted a Rule 104(a) hearing to determine the admissibility of the references to the John Doe murder under Rule 404(b) and the Confrontation Clause. If it determined the statements were admissible, it should have instructed the jury on their limited permissible use. It did neither. This too was reversible error.

IV.

For sake of completeness, we briefly address defendant's additional argument that the cumulative impact of trial court's errors raised in Points I

and II warrant a new trial. Cumulative error occurs when errors that would not require reversal by themselves, together "cast doubt on [the] verdict and call for a new trial." Sanchez-Medina, 231 N.J. at 469. While we have found those errors independently warrant a new trial, considered cumulatively, they certainly "undermined defendant's right to a fair trial" and "raise serious questions about whether the outcome was just, particularly in light of the strength of the evidence presented." Ibid.

V.

Finally, defendant argues that he was denied a fair trial because the court's instruction to the jury to continue deliberating was inadequate. When the jury indicated it was deadlocked, the court did not provide Model Jury Charge, "Judge's Instructions on Further Jury Deliberations" (Jan. 14, 2013).[6]

---

[6] The model charge states:

> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow

We note that initially, two jurors disagreed with the other ten. Only one of those two was excused from the jury. While we do not reach the merits of defendant's argument, we provide the following guidance to the court on remand. If the jury indicates that it is unable to reach a unanimous verdict, the court shall instruct the jury in accordance with State v. Czachor and consider "such factors as the length and complexity of trial and the quality and duration of the jury's deliberations." 82 N.J. 392, 407 (1980). If the court deems it appropriate to instruct the jurors to continue deliberating, it shall administer the model jury charge.

We also do not reach defendant's excessive sentence argument.

Reversed and remanded for retrial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

jurors, or for the mere purpose of returning a verdict. You are not partisans. You are judges—judges of the facts.